MARCHETTI, APPELLEE, *v.* KALISH ET AL., APPELLANTS.

[Cite as Marchetti *v.* Kalish (1990), 53 Ohio St. 3d 95.]

(No. 89-1424—Submitted May 9, 1990—Decided August 15, 1990.)

*Law Offices of Perchick, Lallo &
Feldman* and *Mario deCaris,* for appellee.

*Keller, Scully & Williams Co.,
L.P.A.,* and *G. Michael Curtin,* for appellants.

ALICE ROBIE RESNICK, J. The
issue for this court's determination is
whether a participant in a recreational
or sporting activity can recover for
personal injuries received during the
course of the activity absent evidence
of reckless or intentional conduct.[2]
Stated differently, the question is
whether a showing of negligence will
suffice to allow recovery under these
circumstances. The court of appeals
adopted Sections 50 and 892A of the
Restatement of Torts 2d, and essentially applied a negligence standard.
Since these issues have not been
previously addressed by this court, we
must determine the proper standard as
to the liability of persons engaging in a
recreational or sporting activity.

I

Legal commentators have identified three distinct standards which
are used by some jurisdictions to permit recovery for injuries received during sports and recreational activities:
(1) intentional tort, *i.e.,* assault and
battery; (2) willful or reckless misconduct; and (3) negligence. See Note,
Civil Liability of Athletes — Professional Football Player May Have Tort
Claim For Injuries Intentionally Inflicted During Football Game (1980),
84 Dick. L. Rev. 253; Comment, Civil
Liability: An Alternative to Violence in
Sporting Events (1988), 15 Ohio N. U.
L. Rev. 243; Note, Participant In
Athletic Competition States Cause of
Action For Injuries Against Other Participant (1977), 42 Mo. L. Rev. 347.
However, courts traditionally have not
been inclined to allow a cause of action
for injuries received during participation in such activities. In *Kuehner* v.
*Green* (Fla. 1983), 436 So. 2d 78, 81,
Justice Boyd, concurring specially,

---

[2] We will employ the term
"intentional" as it is defined in 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A. Likewise, we shall employ the term
"reckless" as it is defined in 2 Restatement
of the Law 2d, Torts (1965) 587, Section
500. Respectively, these definitions are as
follows:

"The word 'intent' is used throughout
the Restatement of this Subject to denote
that the actor desires to cause consequences of his act, or that he believes that
the consequences are substantially certain
to result from it." Restatement of Torts 2d,
Section 8A.

"The actor's conduct is in reckless
disregard of the safety of another if he does
an act or intentionally fails to do an act
which it is his duty to the other to do, knowing or having reason to know of facts which
would lead a reasonable man to realize, not
only that his conduct creates an unreasonable risk of physical harm to another, but
also that such risk is substantially greater
than that which is necessary to make his
conduct negligent." Restatement of Torts
2d, Section 500.

noted that "[h]istorically, the courts have been reluctant to allow persons to recover money damages for injuries received while participating in a sport, especially a contact sport, unless there was a deliberate attempt to injure. In denying recovery, the courts have often explained that a person who participates in a sport assumes the risk that he or she may be injured. Only recently have some courts allowed a sport participant to recover damages for injuries resulting from unintentional but reckless misconduct. See *Hackbart* v. *Cincinnati Bengals, Inc.*, 601 F. 2d 516 (10th Cir.), *cert. denied*, 444 U.S. 931, 100 S. Ct. 275, 62 L. Ed. 2d 188 (1979); *Nabozny* v. *Barnhill*, 31 Ill. App. 3d 212, 334 N.E. 2d 258 (1975). These courts reasoned that a sport participant does not assume the risk of injuries resulting from bodily contact uncustomary to or prohibited by the rules of the particular sport."

Likewise, while allowing a recovery for a sports injury based on intentional tort, a Michigan court has stated that "[p]articipation in a game involves a manifestation of consent to those bodily contacts which are permitted by the rules of the game. Restatement of Torts, 2d, § 50, comment b. However, there is a general agreement that an intentional act causing injury, which goes beyond what is ordinarily permissible, is an assault and battery for which recovery may be had." *Overall* v. *Kadella* (1984), 138 Mich. App. 351, 361 N.W. 2d 352, 355. Thus, courts generally allow a cause of action for injuries sustained in recreational or sports activities only under reckless or intentional tort theories.

In *Hanson, supra*, the court of appeals held that there is no liability for participants in an athletic competition for conduct which falls short of an intentional tort. The court in *Hanson* was confronted with a plaintiff injured while competing in a collegiate lacrosse match. The court stated that "* * * the only cause of action in the instant situation that can exist (and thus survive a summary judgment motion) is an intentional tort * * *." *Id.* at 60, 526 N.E. 2d at 329. The court thus affirmed the summary judgment granted in favor of the defendant, holding that "* * * the facts as presented to the trial court show no element of an intent to injure on the part of [defendant] Kynast." *Id.* A review of case law from other jurisdictions supports the proposition set forth in *Hanson*. See *Nabozny* v. *Barnhill* (1975), 31 Ill. App. 3d 212, 334 N.E. 2d 258; *Oswald* v. *Twp. High School Dist. No. 214* (1980), 84 Ill. App. 3d 723, 406 N.E. 2d 157 (liability for injuries sustained in an athletic competition cannot be predicated upon ordinary negligence; rather, willful and wanton misconduct must be shown); *Kabella* v. *Bouschelle* (App. 1983), 100 N.M. 461, 672 P. 2d 290 (minor lacked cause of action predicated on negligence against another minor for injuries sustained in an informal game of tackle football; cause of action must be predicated upon reckless or intentional conduct); *Ramos* v. *Countryside* (1985), 137 Ill. App. 3d 1028, 485 N.E. 2d 418 (fourteen-year-old boy who struck eight-year-old boy in the eye with ball while playing the game of "bombardment" could not be held liable for younger boy's injury on theory of negligence, since both were participating in a sporting event); *Keller* v. *Mols* (1987), 156 Ill. App. 3d 235, 509 N.E. 2d 584 (plaintiff injured in floor hockey game on neighbor's patio was precluded from recovery for injuries on negligence theory); *Turcotte* v. *Fell* (1986), 68 N.Y. 2d 432, 510 N.Y. Supp. 2d 49, 502 N.E. 2d 964 (plaintiff's complaint was properly dismissed where plaintiff did not claim that defendant intentionally or recklessly caused injury, but only that injury was the result

of carelessness); *Ross* v. *Clouser* (Mo. 1982), 637 S.W. 2d 11 (a cause of action for personal injuries incurred during athletic competition must be predicated on recklessness, not mere negligence).

## II

Appellee argues that these cases from other jurisdictions are distinguishable from the present case because here we are dealing with children involved in a simple neighborhood game rather than an organized contact sport. However, courts in other jurisdictions have not made this distinction as to whether the injury arises in an organized activity, neighborhood game, or whether it involves children or adults. For example, in *Kabella, supra,* a minor child was injured while playing a game of tackle football. The court noted that "* * * the players at the time of the infliction of Kabella's injury were not involved in any organized athletic activity being played under the supervision of coaches or referees, or a definite set of rules. The participants were playing under a loose set of rules informally agreed upon among themselves." *Id.* at 464, 672 P. 2d at 293. Likewise, in *Keller, supra,* the injured plaintiff was a minor playing floor hockey on a neighbor's porch. The court stated that "* * * [w]e find no basis for imposing a greater duty of care on youths merely because their games have shifted from the school gymnasium to their homes." *Id.* at 237, 509 N.E. 2d at 586. The court in *Ramos, supra,* was confronted with minor children playing a game called "bombardment," yet the court made no distinction based on age.

The common thread in these three cases and the instant case is that the children involved were engaging in some type of recreational or sports activity. Whether the activity is organized, unorganized, supervised or unsupervised is immaterial to the standard of liability. *Keller, supra,* at 237, 509 N.E. 2d at 586. To hold otherwise would open the floodgates to a myriad of lawsuits involving the backyard games of children. Furthermore, the courts in *Kabella, Keller* and *Ramos* did not differentiate between adults' and children's recreational and sports activities. Rather, the courts applied the same standard of liability to children's sports activities as to those of adults.

Additionally, appellee urges this court to follow the court of appeals in adopting the view taken in the Restatement of Torts 2d, Sections 50 and 892A. These sections provide as follows:

"892A. Effect of Consent

"(1) One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it.

"(2) To be effective, consent must be

"(a) by one who has the capacity to consent or by a person empowered to consent for him, and

"(b) to the particular conduct, or to substantially the same conduct.

"(3) Conditional consent or consent restricted as to time, area or in other respects is effective only within the limits of the condition or restriction.

"(4) If the actor exceeds the consent, it is not effective for the excess.

"(5) Upon termination of consent its effectiveness is terminated, except as it may have become irrevocable by contract or otherwise, or except as its terms may include, expressly or by implication, a privilege to continue to act."

"50. Apparent Consent.

"The rule stated in § 892(2) as to apparent consent to the invasion of an interest applies to the intentional invasion of interests of personality."

Comment *b* to Section 50 of the Restatement provides as follows:

"*Taking part in a game.* Taking part in a game manifests a willingness to submit to such bodily contacts or restrictions of liberty as are permitted by its rules or usages. Participating in such a game does not manifest consent to contacts which are prohibited by rules or usages of the game if such rules or usages are designed to protect the participants and not merely to secure the better playing of the game as a test of skill. This is true although the player knows that those with or against whom he is playing are habitual violators of such rules."

The position taken by the Restatement involves an examination of the injured person's scope of consent in the context of the particular rules of the recreational or sports activity involved. Hence, the emphasis under the Restatement would be initially on the consent of the plaintiff rather than on the conduct of the other player. The next step would entail an analysis by the trial court of the applicable rules of the game or sport, and then superimposing these rules on the plaintiff's state of mind to determine the scope of his or her consent. The present case, or indeed any case involving children's recreational or sport activities, demonstrates the difficulty associated with this standard. We believe that requiring courts to delve into the minds of children to determine whether they understand the rules of the recreational or sports activity they are engaging in could lead to anomalous results. In this context, we perceive no reason to distinguish between children and adults. The policy which we and other courts seek to advance was set forth in *Nabozny, supra:* "[T]he law should not place unreasonable burdens on the free and vigorous participation in sports by our youth. However, we also believe that organized, athletic competition does not exist in a vacuum. Rather, some of the restraints of civilization must accompany every athlete onto the playing field. One of the educational benefits of organized athletic competition to our youth is the development of discipline and self-control." *Id.* at 215, 334 N.E. 2d at 260. Moreover, the court in *Ross, supra,* reiterated this policy, stating that "[f]ear of civil liability stemming from negligent acts occurring in an athletic event could curtail the proper fervor with which the game should be played and discourage individual participation, yet it must be recognized that reasonable controls should exist to protect the players and the game. Balancing these seemingly opposite interests, we conclude that a player's reckless disregard for the safety of his fellow participants cannot be tolerated. If a plaintiff pleads and proves such recklessness, he may seek relief for injuries incurred in an athletic competition." *Id.* at 14. Thus, our goal is to strike a balance between encouraging vigorous and free participation in recreational or sports activities, while ensuring the safety of the players. The standard announced today does not curtail, but indeed enhances this objective, regardless of whether the participants are children or adults.

We therefore decline to adopt the analysis under the Restatement of Torts 2d, Sections 50 and 892A. Traditional tort concepts place the emphasis on the conduct or actions of the tortfeasor. Thus, we join the weight of authority set forth above and require that before a party may proceed with a cause of action involving injury

resulting from a recreational or sports activity, reckless or intentional conduct must exist.[3] We hold that where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either "reckless" or "intentional" as defined in Sections 500 and 8A of the Restatement of Torts 2d.

In the present case, plaintiff-appellee's own testimony demonstrates that appellant did not act either recklessly or intentionally.[4] Thus, there is no question of fact that needs to be resolved regarding this material issue. Additionally, appellee is deemed

---

[3] Comments *f* and *g* to Section 500 of the Restatement of Torts 2d, *supra,* at 590, provide a concise analysis which differentiates between the three mental states of tortious conduct with which we are confronted. Without further discourse, we cite to these comments with approval. They provide as follows:

"*f. Intentional misconduct and recklessness contrasted.* Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.

"*g. Negligence and recklessness contrasted.* Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind."

[4] Appellee's deposition testimony included the following:

"Q    What happened? Why don't you tell me in your own words what happened that day?

"A:    Okay. We were playing kick the can.

"Q:    Okay.

"A:    And when you play, there's a person who is it and everybody hides. And the person who is it has to get—you have a ball or an object that you use as, you know, the base or whatever.

"The object is to get on the — for the person who is it, the object is to get there and call someone's name, where they're hiding or where they're at, so that they are it.

"I was standing on the ball, and Rich was about 15 feet away, maybe more, maybe less. And I was standing on the ball, and I said, 'Rich, running.'

"And he kept running. He was supposed to stop, because when you play, he was already it.

"But when he was coming towards me, he didn't actually mean to, I don't think he meant to hit me, but he, like, kicked the ball in frustration.

"And that's when I fell, and my leg was broke."

to have assumed the risk by voluntarily participating in the game. Since there has been no showing of reckless or intentional conduct on the part of appellant, the trial court was correct in granting summary judgment in appellant's favor. We reverse the judgment of the court of appeals and reinstate the trial court's judgment.

*Judgment reversed.*

SWEENEY, HOLMES, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.

MOYER, C.J., concurs separately.

MOYER, C.J., concurring. I concur separately in the judgment of the majority because I believe the opinion and the syllabus should be confined to the issue presented in the case — the test for determining the civil liability of children (and their parents) arising from their conduct while at play — and because I would hold that minors engaged in recreational or unorganized sports activities are liable only for their intentional acts. The prospect of judging the conduct of children while at casual play on a scale of negligence should cause us to ask ourselves what has changed since Robert Louis Stevenson observed in 1888 that "[y]outh is wholly experimental." A Letter to a Young Gentleman Who Proposes to Embrace the Career of Art, in The Lantern Bearers and Other Essays (Treglown Ed. 1988) 244.

Appendix

KICK THE CAN

*Three or more players*
*Tin can (or ball)*
*Marker to indicate home*
OBJECT. *To keep from being captured by It, and to release those already caught.*

Choose the player who will be It. Designate a rock, a manhole cover, sweater, or other object to be the can's "home." Place the can on its home.

Any player other than It kicks the can away from its home as far as possible. Everyone runs and hides while It retrieves the can, using only his feet. After It has found the can and placed it on its home, he begins seeking for the other players. (In some versions, It must also count to 100 or run around home several times, to give the other players even more time to hide.)

When It spots someone, he quickly runs to home, bangs the can against the ground, and shouts out the spotted player's name, followed by "Kick the can —1—2—3." The player is then considered captured, and must settle down near home. Free players can release captured players by sneaking up while It is out hunting and kicking the can away from its base. Then all those who were captured are freed, and It must go and retrieve the can again before continuing to search for hiders.

When everyone has been captured by It, the first player captured becomes the new It. Since it is very hard to capture everyone in this game, it's often played that anyone captured a certain number of times (usually three) becomes the new It immediately.