HOOVER, Admr., et al., Appellants,

v.

SHIPLEY, Appellee.

[Cite as *Hoover v. Shipley* (1991), 70 Ohio App.3d 256.]

Court of Appeals of Ohio,
Perry County.

No. CA–405.

Decided Oct. 3, 1991.

*Jeffrey A. Hooper* and *Jack J. McClelland,* for appellants.

*Walter Siemer,* for appellee.

GWIN, Judge.

The above captioned plaintiffs ("appellants") appeal from the summary judgment entered in the Perry County Court of Common Pleas dismissing appellants' complaint and entering judgment in favor of defendant, Randy Shipley ("appellee"), after finding no genuine issue as to any material fact existed and that appellee was thereby entitled to judgment as a matter of law. Appellants assign the following as error:

"The trial court erred in finding that there is no genuine issue as to any material fact and that defendant-appellee is entitled to judgment as a matter of law."

On December 4, 1986, at approximately 1:00 p.m., a party of fourteen persons went deer hunting on property owned by Tim Stenson's family. This property was covered with secondary growth brush, brush undergrowth and low-growing, shrub-type trees with dried leaves that had not fallen. The maximum visibility in the area at issue was forty yards or one hundred twenty feet.

The hunting party employed a hunting method known as a "deer drive." In the instant case, the hunters performed this method by dividing into two groups, "the drivers" and "the standers." The drivers took northerly positions that formed an east-to-west line. Meanwhile, the standers took fixed southerly positions that also formed an east-to-west line. At a designated time, the drivers would begin to move south in order to drive or flush deer from the dense underbrush past the line of deployed standers, thereby permitting the standers to shoot the deer.

Tim Stenson, the hunter most familiar with the property, deployed the standers in their fixed southerly positions. Clarence Crosby was placed in the most eastern position, with Kerry G. Hoover, decedent, to the west of Crosby, and appellee in the next western position. Stenson then placed Chucky Shipley, appellee's brother, in the next western position and other standers were subsequently placed in a western direction. The end result was an irregular line of standers in a general east-to-west direction with distances from forty to seventy-five yards between them.

After the drive began, appellee from his fixed position saw a deer approaching him in a southwesterly direction. Appellee claimed that he waited for the deer to cross onto the south side of the line of standers before he shot at the deer. Apparently missing with his first shot, appellee took aim and shot at the deer a second time. Again, appellee claimed that at the time of his second shot, the deer was located on the south side of the line of standers. Appellee stated that after his second shot the deer turned north and ran back through the line of standers onto the north side of the line of standers. At this point, appellee stated, he heard a third shot which he later learned came from his brother's gun.

After the third shot, Crosby discovered decedent's lifeless body on the ground. There was evidence of a gunshot hole through decedent's head with brain matter on the ground to the right side of decedent's head.

Larry Toki, the State Game Protector assigned to Perry County, along with other law enforcement officials and emergency personnel arrived at the scene. An investigation was conducted, wherein two spent, twelve-gauge shotgun casings were found eighty-five and one-third yards from the decedent's head. All firearms involved in the incident were collected and sent to the Bureau of Criminal Investigation in London, Ohio, where it was determined the two spent casings were from appellee's gun.

Upon further investigation, including numerous measurements, calculations of trajectory, location of decedent's body, location of brain matter, location of the spent shotgun casings, and the Bureau of Criminal Investigation report, Toki concluded the shot that killed decedent was from appellee's gun.

On December 4, 1987, appellants filed the within wrongful death action against appellee. As noted above, the trial court granted summary judgment in favor of appellee, dismissed appellant's cause of action, and entered judgment as a matter of law in appellee's favor.

### Summary Judgment

When reviewing motions for summary judgment pursuant to Civ.R. 56, "[t]he inferences to be drawn from the underlying facts contained in the affidavits and other exhibits must be viewed in the light most favorable to the party opposing the motion, and if when so viewed reasonable minds can come to different conclusions the motion should be overruled." *Hounshell v. American States Ins. Co.* (1981), 67 Ohio St.2d 427, 433, 21 O.O.3d 267, 271, 424 N.E.2d 311, 315. Furthermore, when reviewing summary judgments, we, as a reviewing court, stand in the shoes of the trial court. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 30 OBR 78, 79, 506 N.E.2d 212, 214–215.

It is appellants' claim that reasonable minds can come to different conclusions as to whether appellee proximately caused the death of decedent and whether appellee's actions were reckless when examining the facts contained in the affidavits and depositions in a light most favorable to appellants. We agree.

### Proximate Cause

Appellee asserts that there is no evidence the shot which killed decedent came from his gun, but instead the evidence demonstrates decedent was killed by a bullet which ricocheted.

All the evidence before us indicates there were three bullets shot prior to decedent's death. Appellee admits that two of those shots were fired by him and the third shot was fired by his brother. Toki, through deposition, stated that the Bureau of Criminal Investigation concluded that the two spent shell casings found approximately eighty-five yards from decedent's head were from appellee's gun. As stated above, Toki opined that the investigation following decedent's death conclusively demonstrated to him that decedent was killed by a bullet fired by appellee.

When asked whether there was any evidence from the investigation that might indicate appellee was not the hunter who fired the fatal shot, Toki in his deposition replied:

"There is not doubt in my mind. I have no other reservations that * * * [appellee] was the shooter. From the positions the family had placed the younger brother and there was only three shots fired, that's been determined by everyone close enough or within hearing distance that his relationship and relationship with the victim would have been shooting uphill and almost shooting head on * * *. Because the youngest Shipley boy was in a hook fashion, a J fashion from the other three members that were in line. Crosby, * * * [decedent], * * * [appellee] were all pretty much in a straight line as my tape measuring and indications would have the spent casings. And we know the casings there at the scene, that * * * [appellee] admitted firing, came from his gun and only * * * [appellee] had control of his gun at that time."

When asked whether the bullet that killed decedent could have ricocheted, Toki responded in his deposition:

" * * * It's possible. I have found no indications to prove that there was a ricochet. I saw none. And again, from where I hung the bandages, the line of trajectory from the victim's entrance side of the wound back to the fired casings, that path was walked more than once by myself and other persons, I saw nothing to indicate that there was any ricochet at all."

Upon review of this evidence in the light most favorable to appellants, we conclude there is some evidence upon which reasonable minds could conclude appellee proximately caused the death of decedent.

## Reckless Conduct

In his motion for summary judgment, appellee relied upon *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 559 N.E.2d 699, and *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705. The law in those cases respectively provide in the syllabus:

"Where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either 'reckless' or 'intentional' as defined in Sections 500 and 8A of the Restatement of Torts 2d."

"1. Between participants in a sporting event, only injuries caused by intentional conduct, or in some instances reckless misconduct, may give rise to a cause of action. There is no liability for injuries caused by negligent conduct. (*Marchetti v. Kalish* [1990], 53 Ohio St.3d 95, 559 N.E.2d 699, approved and followed.)"

There is no evidence before us, nor is there an assertion, that appellee's actions were intentional. Instead, the issue before us is whether appellee's actions were reckless. The Ohio Supreme Court set forth the definition of "reckless conduct" in *Marchetti, supra,* at 96, 559 N.E.2d at 700, fn. 2:

" 'The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' Restatement of Torts 2d, Section 500."

When reviewing the facts before us in a light most favorable to appellants, we believe reasonable minds could conclude that appellee's conduct was in reckless disregard for the safety of the other hunters.

When dealing with a dangerous or potentially lethal instrumentality, such as a loaded firearm, the circumstances under which that instrumentality is used generally govern what is ordinary care. *Wanyek v. McMullin* (1965), 3 Ohio App.2d 15, 16, 32 O.O.2d 78, 79, 209 N.E.2d 223, 224. Here, the hunters were involved in a "common" but dangerous method of hunting deer. Toki in his deposition stated:

" * * * Deer drives are potential time bombs or accidents waiting to happen. When you have armed persons driving deer, armed persons standing and deer running to and from, you have standers in the woods, basic firearms handling applies, don't shoot in my direction, I won't shoot in your direction. Shoot only if you can—if a deer runs between us, shoot him only if you can see the other person beyond you, or wait till the deer gets behind you where you know it's safe and then shoot away from the drivers or away from the standers."

Under these circumstances, a hunter exercising ordinary care would be extremely careful not to shoot in the direction of other hunters, but to wait until he had a clear shot away from the drivers and standers.

Toki further opined in his deposition that he believed appellee violated the basic hunting rule of:

" * * * Don't shoot off to your left or right flank knowing that you're on stand. In other words, you're shooting towards your fellow man. You know, your standers. Even though you may not see him, you know there's a man to your left or your right because you're on stand. Basic rules would say don't fire to the front because you have drivers, don't fire to the left or right because you have standers. Fire only when the deer passes you and goes behind you. Because only then are you in a safe field of zone or what we would call a field of fire. You know, indication is no one in your party's behind you but you have persons in front of you and persons off your left and right flank. I think that's violating basic safety rules. It would be no different with you and I goose hunting. Even though I can't see you, even though I flush a bird or flush a rabbit, I certainly don't shoot in your direction because I may hit you. This is part of the ethics, part of the responsibilities taught in our hunter safety and good firearms and good gun—safe gun handling would indicate this."

From all of the above facts and opinions, especially the location of the spent shell casings, we believe reasonable minds could conclude that when appellee fired his gun he acted in reckless disregard for the safety of the standers east of him. The location of the spent shell casings indicates appellee intentionally shot his gun to the northeast side of the line of standers under circumstances in which he knew other hunters were located and with knowledge that would lead a reasonable man under the circumstances to realize that by shooting his gun in such a direction he was creating a risk of physical harm or death to another hunter and which risk was substantially greater than that which is necessary to make such conduct negligent.

Accordingly, we find appellants have provided sufficient factual support that appellee proximately caused the death of decedent and appellee's conduct

was reckless. Therefore, we sustain appellant's assignment of error and reverse the judgment entered in the Perry County Court of Common Pleas.

For the foregoing reasons, the judgment entered in the Perry County Court of Common Pleas is hereby reversed, and we remand this cause to that court for further proceedings according to law.

*Judgment reversed*
*and cause remanded.*

MILLIGAN, P.J., and WILLIAM B. HOFFMAN, J., concur.