[Cite as *Konet v. Roberts*, 2016-Ohio-1306.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| KENNETH KONET, et al., | : | **O P I N I O N** |
| Plaintiffs-Appellants, | : | |
| - vs - | : | **CASE NO. 2015-P-0030** |
| JACK W. ROBERTS, | : | |
| Defendant-Appellee. | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2014 CV 00082.

Judgment: Affirmed.

*Kenneth P. Abbarno* and *Alyssa C. Dechow,* The Skolnick Weiser Law Firm, LLC, 1419 West Ninth Street, Second Floor, Cleveland, OH 44113 (For Plaintiffs-Appellants).

*David C. Engle,* 1900 Polaris Parkway, Suite 200B, Columbus, OH 43240 (For Defendant-Appellee).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellants, Kenneth Konet, et al., appeal the summary judgment of the Portage County Court of Common Pleas in favor of appellee, Jack W. Roberts, on appellants' personal injury and loss of consortium claims against appellee. At issue is whether appellants' claims are barred by the recreational use doctrine. For the reasons that follow, we affirm.

{¶2} On January 30, 2014, appellants, Kenneth Konet and his wife, Sheryl Konet, filed a complaint against appellee, Jack W. Roberts, alleging that Ken sustained injury to his hand and that Sheryl sustained loss of consortium as a result of Jack's alleged negligence or recklessness during a boating accident. Appellants sought unspecified damages in excess of $50,000.

{¶3} Jack filed an answer, denying the material allegations of the complaint. Upon completion of discovery, Jack filed a motion for summary judgment, arguing that appellants' claims were barred by the recreational use doctrine because, at the time of Ken's injury, he and Jack were fishing, a recreational activity, and Jack's actions were neither reckless nor intentional. In support, Jack filed Ken's deposition and other evidentiary materials. Appellants filed a brief in opposition and the parties' depositions in support.

{¶4} The statement of facts that follows is based on the parties' depositions and evidentiary materials, construing them in a light most favorable to appellants.

{¶5} The parties are friends and neighbors and live across the street from each other in Streetsboro, Ohio. Ken was 72 years old and Jack was 63 at the time of the incident. Jack owns a 16-foot long motor boat, which he and Ken use to go fishing.

{¶6} Ken and Jack went fishing in Jack's boat about 15 times. Most of these fishing trips took place in 2013. Their boating/fishing trips were just for fun and relaxation; Ken never paid Jack to be his guide and they never fished for profit.

{¶7} On October 15, 2013, Ken and Jack went boat fishing on Mosquito Lake in Cortland, Ohio. It was a beautiful, clear day. They left Jack's house at about 6:00 a.m. and arrived at Mosquito Lake at about 7:30 a.m. Upon putting the boat in the water,

2

Jack drove it to their favorite location on the lake, which is over a sunken bridge that has been there since Jack was a child. They always fished there because the fish were attracted to the bridge and Ken and Jack always had good luck fishing in this spot. Before October 15, 2013, Jack and Ken fished over the bridge about five times.

{¶8} Ken testified that whenever he and Jack would fish over the bridge, they would "hook the bridge." Ken said they "preferred" to hook the bridge because this anchored the boat to the bridge and prevented the boat from drifting away.

{¶9} Jack taught Ken how to hook the sunken bridge just as Jack's father taught him how to do it when Jack was a boy. Hooking the bridge is a two-man operation. Jack operates the boat while sitting in the captain's chair and Ken, who was supposed to be sitting in the front of the boat, hooks the bridge, using a J-shaped steel hook attached to a long rope. Once they arrive in the general location of the bridge, Jack slows the boat down by going back and forth between neutral and forward, allowing the boat to coast over the bridge. While Jack is thus maneuvering the boat, Ken drops the rope into the water and drags the hook along the bottom of the lake while holding the rope until the hook grabs onto some part of the bridge. When the hook catches the bridge, Ken tells Jack he's "got it," and Jack puts the boat in neutral. Ken then takes up the slack, which pulls the boat over to the bridge until the rope is straight up and down holding the boat directly over the bridge. Ken then wraps the rope around one of the two cleats that are on the top of both sides of the front of the boat. At that point, the boat is stationary. If the hook comes loose, Ken would untie the rope from the cleat and they would start over again. Ken said that a regular anchor could not be used because such anchors have a tendency to become tangled in the bridge.

3

{¶10} On October 15, 2013, upon approaching the area over the bridge, Jack slowly moved the boat, while Ken kneeled in the front of the boat holding the rope and dragging the hook. When the hook caught the bridge, Ken pulled the rope up tight and tied it to a cleat, but the hook came off the bridge so he untied the rope from the cleat and put the hook back in the water while Jack coasted the boat over the bridge. When the hook caught the bridge the second time, Ken said, "we're on again."

{¶11} Ken pulled up the rope and wrapped it around the cleat; however, the hook came off again and Ken said, "we're off."

{¶12} Jack put the boat in forward gear and started to turn it around to come back toward the bridge traveling faster than usual. Ken started to lose his balance and grabbed the side of the boat. While the boat was turning, the hook grabbed onto something in the water. Ken told Jack to slow down. Ken did not take the rope off the cleat. While the boat was turning and Ken's hand was between the rope and the cleat, the rope pulled taut and moved against the side of the boat and caught his right ring finger and snapped off the tip of it. Jack then put the boat in neutral. The hook was caught on the sunken bridge and Jack was unable to loosen the hook so he untied the rope from the cleat and threw the entire rope and hook in the water. Jack gave Ken a towel to wrap his hand and drove the boat to the dock.

{¶13} Another boater on the shore drove Ken to the emergency room while Jack hooked the boat to his trailer and drove it home. He then went to the emergency room with his wife to be with Ken. Ken lost about an inch of his finger. Two other fingers on his right hand were broken.

{¶14} Ken testified that Jack did not intentionally or consciously try to harm him and they are still friends. Rather, he said it was just a "mistake" and an "unfortunate incident." Ken said that in the emergency room Jack told him it was his fault because he was going too fast.

{¶15} The trial court granted Jack's motion for summary judgment, finding the parties were engaged in a recreational activity at the time of Ken's injury and Jack's conduct was neither intentional nor reckless.

{¶16} Appellants appeal, asserting three assignments of error. Because they are related, they are considered together. They allege:

{¶17} "[1.] The trial court erred in granting Defendant-Appellee Jack W. Roberts's motion for summary judgment based upon its finding that the doctrine of primary assumption of the risk for recreational activities applies when the parties had not yet begun participating in the recreational activity of fishing at the time the accident occurred.

{¶18} "[2.] The trial court erred in granting Defendant-Appellee Jack W. Roberts's motion for summary judgment based upon its opinion that the injury sustained in this case is an ordinary and foreseeable risk of the recreational activity of fishing.

{¶19} "[3.] The trial court erred in granting Defendant-Appellee Jack W. Roberts's motion for summary judgment based on its opinion that Roberts did not act intentionally or recklessly despite genuine issues of material fact which properly require determination by a trier of fact."

{¶20} Summary judgment is a procedural device intended to terminate litigation and to avoid trial when there is nothing to try. *Murphy v. Reynoldsburg*, 65 Ohio St.3d

5

356, 358 (1992). Summary judgment is proper when: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party, that party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 268 (1993).

{¶21} The party seeking summary judgment on the ground that the nonmoving party cannot prove his claim bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996).

{¶22} The moving party must point to some evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support his claim. *Dresher, supra,* at 293.

{¶23} If this initial burden is not met, the motion for summary judgment must be denied. *Id.* However, if the moving party has satisfied his initial burden, the nonmoving party then has a reciprocal burden, as outlined in Civ.R. 56(E), to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against him. *Dresher, supra.*

{¶24} Since a trial court's decision whether or not to grant summary judgment involves only questions of law, we conduct a de novo review of the trial court's judgment. *DiSanto v. Safeco Ins. of Am.*, 168 Ohio App.3d 649, 2006-Ohio-4940, ¶41 (11th Dist.).

6

{¶25} In order to establish an actionable claim for negligence, the plaintiff must establish: (1) the defendant owed a duty to him; (2) the defendant breached that duty; (3) the defendant's breach of duty proximately caused his injury; and (4) he suffered damages. *Bond v. Mathias*, 11th Dist. Trumbull No. 94-T-5081, 1995 Ohio App. LEXIS 979, *6 (Mar. 17, 1995).

{¶26} Further, "[w]here individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either 'reckless' or 'intentional' as defined in Sections 500 and 8A of the Restatement of Torts 2d." *Marchetti v. Kalish*, 53 Ohio St.3d 95 (1990), syllabus. In *Thompson v. McNeill*, 53 Ohio St.3d 102 (1990), the Ohio Supreme Court held: "Between participants in a sporting event, only injuries caused by intentional conduct, or in some instances reckless misconduct, may give rise to a cause of action. There is no liability for injuries caused by negligent conduct." *Id.* at paragraph one of the syllabus. Thus, pursuant to *Marchetti* and *Thompson*, "recovery is dependent upon whether the defendant's conduct was either reckless or intentional." *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, syllabus.

{¶27} Under the recreational use doctrine, otherwise referred to as the "primary assumption of risk doctrine," the plaintiff assumes the risk of a particular recreational or sporting activity and is barred from recovery on the basis of negligence as a matter of law. *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 431 (1996). Primary assumption of risk differs conceptually from other affirmative defenses that are often raised in a negligence case. *Id.* An affirmative defense in a negligence case asserts that even if the plaintiff has made a prima-facie case of negligence, he cannot

7

recover. *Id.* "A primary assumption of risk defense is different because a defendant who asserts this defense asserts that no duty whatsoever is owed to the plaintiff." *Id.* Because a primary assumption of risk defense means that the duty element of negligence is not established as a matter of law, the defense prevents the plaintiff from even making a prima-facie case. *Id.*

{¶28} Appellants make three arguments. First, they argue that at the time of Ken's injury, he and Jack were not yet participating in a recreational activity because at that time, they were still trying to anchor the boat in anticipation of engaging in the sport of fishing at a future time. They argue that because anchoring is not a part of the sport of fishing, they were merely "preparing" to fish, which does not amount to fishing. They argue that in order for the defense to apply, Ken and Jack would have actually had to cast a fishing line into the water. We do not agree.

{¶29} In *Coblentz v. Peters*, 11th Dist. Trumbull No. 2004-T-0017, 2005-Ohio-1102, this court held that in order for the recreational use defense to apply, the conduct at issue must be an actual part of the recreational activity. *Id.* at ¶21. If the conduct is a part of the recreational activity, the plaintiff assumes the risk of injury associated with the conduct because it is an ordinary risk of the recreational activity. *Id.* Such injury involves conduct that is a foreseeable, customary part of the recreational activity and the recklessness standard applies. *Id.* As a corollary to this rule, the recreational use doctrine does not apply if a person is injured *before* the recreational activity has begun. *Thomas v. Strba*, 9th Dist. Medina No. 12CA0080-M, 2013-Ohio-3869, ¶10. Thus, preparations for a recreational activity are not considered an actual part of such activity

8

and a person causing injury during such preparations is not insulated from liability for negligence. *Id.* at ¶15. In *Thomas*, the Ninth District stated:

> **{¶30}** Any number of preparations might be necessary before one can engage in a recreational activity. For instance, a hunter's preparations undoubtedly would include buying a hunting license, readying his shotgun or bow, and selecting weather-appropriate attire. Those preparations might occur over any number of hours, days, or weeks before any actual hunting commenced. It would be an absurd result if the [recreational use] doctrine barred the recovery of a hunter who slipped and fell in the store where he went to purchase his license or who was injured in a car accident while driving to his hunting destination. The doctrine would not bar those injuries because the recreational activity (i.e., hunting) had yet to begin when the injuries occurred. Moreover, those injuries would not be of the type that a hunter would ordinarily assume as inherent risks of the sport of hunting. *Id.* at ¶16.

**{¶31}** Here, anchoring the boat to the bridge was not merely part of the preparations for fishing; it was an actual part of the parties' recreational activity. They were not just fishing from a pier. Their fishing trips involved the use of a fishing boat and, when fishing at Mosquito Lake, they always fished over the sunken bridge. Each time, they used the same procedures to hook the bridge. In order to stay at their favorite location for fishing, they had to hook the bridge. Otherwise, according to Ken, they would drift away from the bridge. Thus, hooking the bridge was an integral, inherent part of their recreational activity of boat fishing. Further, when hooking the bridge, Jack and Ken were already on the lake, in their boat, and with their fishing equipment, at the area they intended to fish. Moreover, hooking the bridge was not done weeks, days, or even hours before dropping their fishing lines in the lake. *Thomas, supra.* Rather, their practice was to immediately drop their lines upon hooking the bridge. Thus, contrary to appellants' argument, the fact that Ken and Jack had not yet cast their lines in the water does not mean they were not involved in their

recreational activity of fishing. Because hooking the bridge was an essential part of the parties' fishing activity and they were engaged in hooking the bridge when Ken was hurt, they were involved in fishing at that time.

{¶32} Second, appellants argue that, even if the parties were involved in a recreational activity, the injury sustained by Ken was not an ordinary and foreseeable risk of that activity. The types of risks that are covered under the recreational use doctrine are those that are the foreseeable and customary risks of the recreational activity. *Thompson, supra,* at 104-106. Since we hold under appellants' first argument that hooking the bridge was an actual part of the parties' recreational activity, Ken assumed the risk of injury associated with hooking the bridge because that was an ordinary risk of the parties' recreational activity. *Coblentz, supra.* Thus, Ken's injury involved conduct that was a foreseeable, customary part of their fishing activity. *Id.*

{¶33} Appellants argue that, even if hooking the bridge was an integral part of their recreational activity, in the circumstances of this case, there was a question of fact as to whether the risk was foreseeable because Jack was driving the boat too fast and did not make sure the rope was off the cleat.

{¶34} In *Thompson, supra,* the Supreme Court explained what risks are foreseeable and thus assumed by the plaintiff in a recreational activity:

> {¶35} Acts that would give rise to tort liability for negligence on a city street or in a backyard are not negligent in the context of a game where such an act is foreseeable and within the rules. For instance, a golfer who hits practice balls in his backyard and inadvertently hits a neighbor who is gardening or mowing the lawn next door must be held to a different standard than a golfer whose drive hits another golfer on a golf course. A principal difference is the golfer's duty to the one he hit. The neighbor, unlike the other golfer or spectator on the course, has not agreed to participate or watch and cannot be expected to foresee or accept the attendant risk of injury.

10

Conversely, the spectator or participant must accept from a participant conduct associated with that sport. Thus a player who injures another player in the course of a sporting event by conduct that is a foreseeable, customary part of the sport cannot be held liable for negligence because no duty is owed to protect the victim from that conduct.

{¶36} * * *

{¶37} *What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, i.e., the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game.* (Emphasis added.) *Thompson, supra.*

{¶38} Here, the parties were engaged in boating for purposes of fishing. Boating has been held to fall under the recreational use doctrine. *Sebasta v. Holtsberry*, 5th Dist. Licking No. 00CA00018, 2000 Ohio App. LEXIS 4017, *6 (Aug. 17, 2000). Thus, a participant in such activity assumes the ordinary risks of the activity and cannot sue other participants for negligence. *Id.* We agree with the trial court's findings that "[b]oating always has its risks" and that "[r]opes are used on all boats, and these must be handled properly." Boats are potentially dangerous due to many factors, including their inherent instability on the water. Further, ropes are standard equipment in boats and used for many purposes, including anchoring the boat, tying the boat to a dock, securing other boat equipment, and a host of recreational activities. As such, managing boat ropes is an integral and potentially dangerous part of boating. Thus, anyone handling boat ropes while boating assumes the risk involved in their use. Here, Ken was taught to perform his part of the hooking operation and understood Jack's role, i.e., operating the boat. That Jack might drive the boat faster than usual while turning it around or not notice that Ken failed to untie the rope from the cleat were foreseeable, customary risks of hooking the bridge. Since Ken was a participant in this procedure,

11

he assumed these risks and Jack is not liable for his conduct, which, at most, amounted to negligence.

{¶39} Third, appellants argue that, even if they were engaged in a recreational activity and even if Ken's injury was an ordinary, foreseeable risk, genuine issues remained as to whether Jack acted intentionally or recklessly when Ken was injured. We note there was no evidence presented that Ken acted intentionally. In fact, Ken testified he never thought Jack acted intentionally. Rather, he said it was just a mistake and an unfortunate incident and that they remain friends. Thus, in order to avoid summary judgment, Ken was required to present evidence that Jack acted recklessly.

{¶40} Reckless conduct is the *conscious* disregard of a *known* risk of harm to another. *Kinnison v. Ohio State Univ.*, 10th Dist. Franklin No. 13AP-501, 2013-Ohio-5715, ¶7, citing 2 Restatement of the Law 2d, Torts, Section 500 (1965). This court has held that the standard for showing recklessness is high and, as a result, summary judgment can be appropriate in those instances where no evidence is presented of a conscious disregard of a known risk of harm. *Moore v. County of Lake*, 11th Dist. Lake No. 2009-L-053, 2010-Ohio-825, ¶38.

{¶41} The sole conduct on which appellants rely in support of their argument that Jack acted recklessly is that he was driving faster than usual when he turned the boat around; that Jack did not make sure Ken was secure in the boat; and that Jack did not make sure that Ken untied the rope from the cleat. However, Ken testified that the accident was not caused by any "conscious" conduct on Jack's part. As noted above, Jack's conduct at most amounted to mere negligence. We agree with the trial court's finding that because Ken was able to quickly stabilize himself, this shows that Jack's

12

speed in turning the boat around was not so excessive as to constitute a conscious disregard of Ken's safety. With respect to Jack's failure to make sure that Ken was secure and that he untied the rope from the cleat, each of the participants had his own role to play in hooking the bridge. Ken was taught that he was to tie the rope to the cleat once the hook caught the bridge and to untie it if the hook became detached. He was also taught to perform these tasks while sitting (not kneeling as he was) and thus maintaining a secure position in the boat. Unfortunately, at the time Ken was injured, Jack was turning the boat around to bring it back over the bridge and was unable to intervene in that split second when the rope pulled taut against the side of the boat where Ken put his hand.

{¶42} As no evidence of recklessness was presented, the trial court did not err in finding that Jack did not act recklessly and in entering summary judgment in his favor.

{¶43} For the reasons stated in this opinion, the assignments of error are overruled. It is the order and judgment of this court that the judgment of the Portage County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, J., concurs,

THOMAS R. WRIGHT, J., dissents with a Dissenting Opinion.

_____

THOMAS R. WRIGHT, J., dissents with a Dissenting Opinion.

{¶44} I agree with the majority's conclusions that anchoring the boat was an integral part of the fishing trip and that there is nothing evidencing that Jack acted

13

intentionally causing Ken's injuries. However, summary judgment is inappropriate because Ken presented a genuine issue of fact as to Jack's recklessness.

**{¶45}** Reckless conduct is "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶34, citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (1990).

**{¶46}** There is an issue of fact as to whether Jack acted indifferently or with a conscious disregard of a known risk. Specifically, Jack was driving faster than usual on the parties' third attempt to anchor the boat with disregard for Ken's safety. Further, Jack failed to confirm whether Ken had untied the rope from the cleat before Jack powered the boat forward. He acknowledged the known risks associated with anchoring the boat in this manner, but he was unable to confirm whether he took the necessary steps to avoid this precise risk of injury.

**{¶47}** Jack's testimony includes the following exchange:

**{¶48}** "Q  And you were taught that the person in front shouldn't be – should be holding that rope with you're searching for the submerged bridge, right?

**{¶49}** "A  Yes.

**{¶50}** "Q  You as the driver don't want that rope wrapped around the cleat when you're searching for the bridge, right?

**{¶51}** "A  No, sir.

**{¶52}** "Q  Why not?

14

{¶53} "A  * * * You could hook to anything.  That could do a lot of damage to the boat.

{¶54} "Q  Could you do damage or injury to the people in the boat if that happened?

{¶55} "A  Sure.

{¶56} "* * *

{¶57} "Q  So you'd want to avoid ever operating that boat when the rope is attached to that cleat, right?

{¶58} "A  Yes."

{¶59} Jack also fails to verify that he took the necessary steps to confirm that the rope was removed from the cleat:

{¶60} "Q  After Ken got hurt, did you have to remove the rope from the cleat?

{¶61} "A  Yes.

{¶62} "Q  That means you were trying – you were in the process of trying to hook that bridge with the rope on the cleat, correct?

{¶63} "* * *[objection]

{¶64} "A  Yes.

{¶65} "* * *

{¶66} "Q  * * * Don't you want to make sure that the rope is not going to be on the cleat when you're driving?

{¶67} "A  Yes.

{¶68} "Q  So how did the rope make its way onto the cleat if you're watching to make sure it's not on the cleat when you're driving?

**{¶69}** "A  I don't know.

**{¶70}** "Q  Are you saying that Ken put that rope on the cleat while you were driving?

**{¶71}** "A  He must have.  He must have.

**{¶72}** "* * *

**{¶73}** "A  I did not see him attach it to the cleat.  I thought he had it in his hands.

**{¶74}** "* * *

**{¶75}** "Q  Do you have a specific recollection of seeing the rope off of the cleat before you started moving forward again after the hook detached from the bridge?

**{¶76}** "A  No."

**{¶77}** Ken's testimony further establishes that Jack did not take the necessary steps to avoid the risk.  Instead, Jack drove the boat more quickly than ever before once the hook became dislodged from the bridge a second time.  He powered the boat forward even though the rope was still attached to the cleat.  Ken explained,

**{¶78}** "The boat started to go and it started to speed up, and I thought to myself, what the heck is going on here?  I was taken aback. * * * And he started to make a turn at a faster speed, way faster than he's ever gone before doing this procedure.  * * *  I didn't get a chance to take the rope off the cleat.  I put my hand between the rope and the cleat not even realizing this was going to happen, of course.  * * * And all of a sudden, it caught, snapped my finger off."

**{¶79}** Based on the foregoing, a genuine issue of fact exists as to whether Jack operated the boat recklessly.  Thus, I would reverse and remand on this basis.