OPINION
This is an accelerated calendar appeal. Appellant, Andrea Karlovich, appeals from the judgment of the Lake County Court of Common Pleas which granted summary judgment in favor of appellees, Daneane Nicholson and Cindy Square, on appellant's amended complaint for personal injuries following a horse riding accident. For the reasons that follow, we affirm the judgment of the trial court.
Following the death of their father in 1993, appellee Daneane Nicholson ("appellee Nicholson") and her brother William Davis ("Davis") jointly inherited property from their father which was located in Kirtland, Ohio. The property consisted of three houses, a barn, a shed and several horses. Portions of the property had separate street addresses.
At that property, appellee Nicholson's daughter, appellee Cindy Square ("appellee Square") was left a life estate in a house located at 9298 Russellhurst Drive. It is undisputed that a barn is located near the house. Although appellee Square asserted that this barn was not located on the property contained within her life estate, there is no dispute that she maintained insurance on the barn and paid taxes on the property known as 9298 Russellhurst Drive.
Approximately four years prior to the horse riding accident at issue in this case, appellant and appellee Square became friends at work. Appellant became a frequent visitor to appellee Square's home, often visiting several times per week. Over time, appellant also became very friendly with appellee Nicholson, appellee Square's mother.
The relationship between the parties became so close that appellant would often drop by unannounced to visit. During some of these visits, appellant would go to the barn and visit the horses in the stable. At the time of the accident in August 1996, there were four horses on the property. It is uncontroverted that appellee Nicholson and her brother inherited three of the horses after their father's death, namely: a stud horse, a mare named "Foxy" and her foal named "Lucky". A woman mentioned only as Julia, who did not live on the property, owned the fourth horse, "Gray." There is no dispute that Julia had an earlier arrangement with appellee Nicholson's deceased father whereby she agreed to take care of all of the horses and the barn in exchange for the right to board her horse on the property.
Nevertheless, all agree that Square had no ownership interest in the three horses of her mother and uncle. Appellees Nicholson and Square, appellee Square's sister, and family friends occasionally helped clean out the stables, maintain the barn and care for the horses. Appellant also helped care for the horses by cleaning stalls, watering and feeding the horses and other similar activities. According to appellee Square, appellant also took home the tack (saddle, bridle and reins) she was using on Foxy on the day of the accident to clean them. Appellant never disputed this assertion. Thus, appellant was the last person to perform or have the opportunity to perform any inspection or maintenance on the tack.
Moreover, appellee Square herself denied ever taking any action to maintain the tack in question, and, in fact, claimed that it was Julia's tack. Appellee Nicholson similarly denied any knowledge of the tack and denied that she made any effort to maintain the tack. Appellant, however, claimed that because the tack was located in appellee Square's barn, there was an implication that appellee Square owned the tack in question and that she had a duty to ensure that the tack was kept in reasonable repair because she was aware that somebody was using it while riding the horses.[1] Furthermore, appellant argued that because actual ownership was disputed, the question of ownership should have been decided at trial.
On several occasions, appellant purchased feed for the horses and was then reimbursed by appellee Nicholson. Appellant testified in her deposition that she had discussions with appellee Nicholson during which she reported to her all of the things that Julia failed to do for the horses.
In the spring of 1996, Foxy gave birth to her foal, Lucky. There was some dispute as to whether appellees Nicholson and Square were aware that appellant began riding Foxy in July 1996. Appellant said she did so in an effort to get Foxy "back into shape" following the birth.
Between the time of Lucky's birth and the date of the accident, a two-month period, appellant rode Foxy approximately ten times.[2] Foxy was still nursing Lucky. According to appellant, she did not know at the time of these rides that special precautions must be taken when riding a mare with an unweaned foal, to wit: that the two must not become separated as the mare could become uncontrollable in an effort to get back to her foal.[3] Therefore, appellant made no effort to ensure that Lucky was always in close proximity to Foxy during her rides.
Appellant conceded that Foxy was not "easy to control." Appellant also conceded that Foxy went out of control on two separate occasions in the weeks preceding the accident. In the first instance, which occurred only three weeks prior to the accident, appellant was riding Foxy in the back paddock when Foxy "ran hard for the barn." Appellant testified that she believed Foxy ran to the barn because the horse "knows somebody's on her back, so she tries to injure the rider." In the second instance, just one week prior to the accident, Foxy suddenly veered off into a group of trees, causing appellant's face to be scratched from the branches.
Despite these incidents and appellant's own admission that she considered herself an inexperienced horse rider, appellant attempted to ride Foxy again on the day of the accident in August 1996. When she arrived at the barn, appellee Square and other friends were present. After another friend rode Foxy for a short ride, appellant decided to ride Foxy. Without asking permission, she brought Foxy in from the field and saddled her using tack located in the barn. No one disputes that appellee Square was present and watched as appellant began to ride Foxy.
As appellant and Foxy made their way back to the barn after a very short ride, Foxy "took off" for the barn at a very fast pace. According to appellant, she believed that Lucky became trapped in the barn when one of the others unwittingly closed the barn doors.[4] Appellant attempted to regain control of the horse, however the reins broke and the horse headed straight for a marble tub and a barbed wire fence located in close proximity to the barn. Fearing impact with the tub and fence, appellant attempted to dismount Foxy. However, she hit her back against the barn in the process. Appellant suffered serious injuries as a result, including paralysis.
Appellant thereafter filed suit against appellees Nicholson and Square, and Davis. However, Davis settled the claim against him and is not a party to this appeal. In appellant's amended complaint sounding in negligence, appellant alleged:
 "[Appellees Nicholson and Square] had superior knowledge concerning [Foxy] and knew that [Foxy's] recent pregnancy made her dangerous and difficult to ride and the [appellees] failed to warn [appellant] that the horse was dangerous and that further knew that [appellant] was not an experienced rider and knew or should have known that it was dangerous to permit [appellant] to ride [Foxy]."[5]
Appellees answered each claim asserting assumption of risk in their answers. Following discovery, each appellee individually moved the court for summary judgment in her favor pursuant to this court's decision in Mason v. Komlo (1993),86 Ohio App.3d 577.[6]
Appellant responded with an affidavit and additional briefing was had.
The trial court addressed appellees' motions in a single joint judgment entry, ultimately granting summary judgment in appellees' favor. The trial court found that all of the evidence before it conclusively established that appellant cared for the horses on a gratuitous basis; and, as a result, that she must show the existence of intentional or reckless conduct on appellees' part in order to recover for her injuries. The court relied primarily on our decision in Mason in reaching this conclusion. The trial court found that no intentional or reckless conduct was demonstrated.
Appellant perfected a timely appeal, asserting four assignments of error for our consideration:
 "[1.] The trial court erred as a matter of law in finding the Appellant a licensee rather than an invitee.
 "[2.] The trial court was in error in holding Appellees to the standard of recklessness rather than reasonable care.
 "[3.] The trial court erred in incorrectly applying Ohio equine liability law.
 "[4.] The trial court erred in excluding Appellant's Expert Report."
Initially, we note that summary judgment is proper when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in his favor. Harless v. WillisDay Warehousing Co. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C). An appellate court will apply this same standard to both the facts and the law at issue in its review. See Temple v. Wean United,Inc. (1977), 50 Ohio St.2d 317, 327-328.
This is one of those interesting cases of summary judgment where there are numerous instances of contested factual issues. Nevertheless, summary judgment is still appropriate because the contested facts are not material to the controlling legal issues.
We will address appellant's first, second and third assignments of error in a consolidated fashion as they invoke one common legal analysis. In these assignments, appellant argues that the trial court erred by holding that appellant must prove the existence of reckless or intentional conduct on the part of appellees in order to recover for her injuries, and by considering the evidence in a light most favorable to appellees. According to appellant, the trial court incorrectly classified appellant as a licensee, when she should have been classified as an invitee to whom appellees owed a duty of reasonable care. As a result, appellant's status is indicative of the duty owed to her by the appellees.
The trial court concluded appellant was not an invitee, but instead determined she was a licensee. We agree, as will be discussed later. However, under the uncontroverted facts of this incident, we determine that appellees breached no duty to appellant, regardless of whether she was an invitee or a licensee.[7]
Appellant's own evidence conclusively established that appellant was not caring for appellee Nicholson's horse in exchange for the privilege of riding her. As to appellee Square, there was no Square, there was no evidence of any business invitee relationship with appellant. While appellant argues that her work and labor improved the property and provided a direct benefit to appellees, all of appellant's activities at the barn were admittedly voluntary with no expectation of compensation or other return. Moreover, appellant conceded she was never asked by the appellees to care for the horses or clean the barn. As a result, she was not an invitee as in Mason. Appellant conceded the same during her deposition testimony.
Nevertheless, the uncontroverted evidence established that appellant was at least a social guest of appellees. Appellees have not disputed that appellant had a tacit, open-ended invitation to enter the premises at will and care for the horses. Although there is some dispute as to whether appellees were aware that appellant was riding Foxy prior to the accident, there is no contention that she was forbidden to ride Foxy. Indeed, appellee Square stood by and watched appellant saddle and ride Foxy on the day of the accident.
In Scheibel v. Lipton (1951), 156 Ohio St. 308, the Supreme Court of Ohio set forth the duty a social host owes to her guest. The court held:
 "[2.] A host is not an insurer of the safety of a guest while upon the premises of the host and there is no implied warranty on the part of a host that the premises to which a guest is invited by him are in safe condition.
 "[3.] A host who invites a social guest to his premises owes the guest the duty (1) to exercise ordinary care not to cause injury to his guest by any act of the host or by any activities carried on by the host while the guest is on the premises, and (2) to warn the guest of any condition on the premises which is known to the host and which one of ordinary prudence and foresight in the position of the host should reasonably consider dangerous, if the host has reason to believe that the guest does not know and will not discover such dangerous condition." Id. at paragraphs two and three of the syllabus.
Applying the above to the case at bar, there was no evidence of any implied or expressed warranty made by appellees that the property on their premises, i.e., Foxy and the tack, was in a safe condition suitable for riding. Thus, there was no duty created to that effect.
There is no disagreement that appellees owed appellant a duty to warn her of any known dangers in riding Foxy or dangers of which the reasonable social host should be aware. However, when the evidence shows that the guest was also aware of the danger, then the danger becomes open and obvious and the social host would not owe a duty to additionally warn the guest of the danger. [8] Mullins v. Binsky
(Sept. 24, 1998), Franklin App. No. 97APE11-1451, unreported, at 9-10, 1998 Ohio App. LEXIS 4445,
In the case at bar, appellant's own uncontroverted evidence established that she knew that it was dangerous to ride Foxy, even if she did not know the exact reason why. There is no question that on at least two very recent occasions, her own experience made her aware that Foxy was difficult to control and that Foxy had demonstrated dangerous propensities. Foxy's erratic behavior, in fact, previously injured her, although to a minor degree. She therefore had reason to believe that Foxy might injure appellant again if she continued to ride Foxy. Indeed, appellant indicated that she believed that Foxy had a propensity that caused her to want to injure her riders. There was no evidence that appellees knew of these earlier incidents. Further, it is not clear if they knew appellant had ever ridden Foxy prior to the incident in question.
Despite these factors, appellant chose to ride Foxy. Given appellant's admission of her own personal knowledge of the recent dangerous propensities of Foxy, any failure of appellees as social hosts to warn her of the dangers of riding a mare with an unweaned foal could not have been the proximate cause of the injuries. Appellant should have reasonably expected to encounter the risk of injury which she encountered. She voluntarily assumed the primary risk of riding Foxy as a matter of law. Here, we note that we would have been faced with a very different case had appellant been injured the first time that she rode Foxy following the birth of the foal when she did not have firsthand knowledge of Foxy's dangerous propensities.
Even if appellees violated the duty of care owed appellant, she assumed the risk by riding a horse whose behavior she knew was erratic and dangerous. See Lamendola v. Beatty (Mar. 29, 1991), Portage App. No. 90-P-2159, unreported, 1991 Ohio App. LEXIS 1412, citing Marchetti v. Kalish (1990), 53 Ohio St.3d 95 and Thompsonv. McNeil (1990), 53 Ohio St.3d 102.
Lamendola, Marchetti and Thompson all dealt with situations where co-participants in a recreational activity brought suit against another participant for personal injury caused by the other participant's conduct during the activity.[9] TheMarchetti court held:
 "Where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either `reckless' or `intentional' as defined in Sections 500 and 8A of the Restatement of Torts 2d." Marchetti at syllabus.
At paragraphs one and two of the syllabus, the Thompson court held:
 "[1.] Between participants in a sporting event, only injuries caused by the intentional conduct, or in some instances reckless misconduct, may give rise to a cause of action. There is no liability for injuries caused by negligent conduct. (Marchetti v. Kalish * * *, approved and followed.)
 "[2.] A player who injures another player in the course of a sporting event by conduct that is a foreseeable, customary part of the sport cannot be held liable for negligence because there is no duty owed to protect the victim from that conduct." (Citations omitted.)
In these holdings, the Supreme Court essentially applied the doctrine of primary assumption of the risk to those who engage in recreational activities. As paragraph two of the syllabus inThompson indicates, the rational behind the doctrine is that there is no duty to protect a person from the inherent risks attendant to engaging in recreational activities. Seen in another light, the Supreme Court of Ohio has judicially decreed that injuries incurred by one participant from the negligent conduct of another participant are included within the realm of the ordinary risks of a recreational activity. See Spanger v. Kehres (1995),107 Ohio App.3d 1, appeal dismissed as being improvidently allowed (1996), 75 Ohio St.3d 1218.
"Because a successful primary assumption of the risk defense means that the duty element of negligence is not established as a matter of law, the defense prevents the plaintiff from even making a prima facie case." Gallagher v. Cleveland Browns Football Co. (1996),74 Ohio St.3d 427, 431-432.
Ohio's appellate courts have applied Marchetti and Thompson
to hold that recreational activity participants are similarly barred from bringing suits sounding in negligence against sponsors or other non-participants of the recreational activity. See,e.g., Staadecker v. The Emerald Health Network, Inc. (Dec. 16, 1993), Cuyahoga App. No. 64191, unreported, 1993 Ohio App. LEXIS 6010; However, the injured participant still may maintain, where the facts allow, a cause of action of negligent supervision or negligent entrustment against certain parties. See, e.g.,Whitaker v. Davis (Jan. 27, 1997), Warren App. No. CA96-07-060, unreported, 1997 Ohio App. LEXIS 287; Kline v. OID Associates,Inc. (1992), 80 Ohio App.3d 393; Baker v. Groetz (Nov. 9, 1992), Stark App. No. CA-8845, unreported, 1992 Ohio App. LEXIS 5746. See, also, Brown v. Day (1990), 68 Ohio App.3d 447, citing Hansonv. Kynast (1986), 24 Ohio St.3d 171, 179 (Holmes, J., concurring.).
In Goffe v. Mower (Feb. 5, 1999), Clark App. No. 98-CA-49, unreported, 1999 Ohio App. LEXIS 308, the plaintiff-mother brought a suit sounding in negligence against the owners of a go-cart facility, in part on the grounds that the race track was negligently designed to create an undue risk of harm when the participants exited their carts at the end of the ride. The plaintiff in Goffe was injured as she attempted to exit her cart at the end of the ride when her daughter accidentally caused another cart to hit her mother.
The owners of the facility argued that the plaintiff was barred from raising this argument because the plaintiff assumed the risk of participating in the recreational activity of go carting. TheGoffe court held:
 "We agree * * * that go-carting is a `recreational activity' and accordingly Ms. Goffe should reasonably expect the ordinary hazards of engaging in that activity. For example, she might expect that while on the track in her cart she might collide with another go-cart.
 "In this case, however, she is not contending that her injury was caused by a fellow participant while riding in her go-cart on the track. She contends the design of the track facility caused her to be vulnerable to a runaway go-cart after she exited her go-cart and before she reached a place of safety." Id. at 6-7.
The Goffe court thereafter analyzed the duty that an operator of an amusement device has to provide a reasonably safe device to his patrons.
We agree with the approach utilized in Goffe. By our inclusion of the footnote in Mason, we implicitly acknowledged that the doctrine of primary assumption of risk is invoked when a participant of a recreational activity attempts to sue a non-participant sponsor or landowner for injuries resulting from the recreational activity. The analysis turns on whether the participant was subjected to risks or hazards that a reasonable participant would not expect to encounter in the particular activity. In evaluating whether a particular risk is deemed outside the ordinary risks that a reasonable participant should expect to encounter, the analysis hinges on what standard of care that recreational participant has a right to expect from the particular sponsor or landowner.
In the case of Troop A. Riding Academy, the Supreme Court engaged in just this type of analysis by laying out what was deemed to be the ordinary risks expected when a person hires a horse for riding. Indeed, the first paragraph of Troop A RidingAcademy holds: "One who rides a horse, which he has hired for that purpose, takes the ordinary risks incident to such pursuit."Id.
The holding in Troop A. Riding Academy tells us that when the rider is an invitee, one who paid a fee to ride the horse on the property of the stable owners, it is the rider who assumes primary risk for injuries incurred as a result of riding the horse as a general rule. The exception would be when the owner has superior knowledge about known propensities or dangers that a particular horse may present.
In the case at bar, the question turns to whether appellant was subjected to risks which a rider in her position would not reasonably expect to be ordinary to the recreational activity of riding a horse belonging to another and which was not for hire. If so, the doctrine of primary assumption of the risk would not
operate to bar her negligence claim against appellees.
Although appellant does not frame her argumentation in this way, she is essentially claiming that she was subjected to certain risks that a reasonable rider in her position would not expect to encounter. Specifically, she maintains that she was an invitee to whom appellees owed a duty of reasonable care. In this context, appellant claims that appellees had a duty to warn her of the dangers of riding a mare with an unweaned foal under circumstances in which the mare and foal could be separated. Appellant also claims that appellees had a duty to provide safe riding equipment,i.e., properly maintained reins.
Regarding the issue of the allegedly defective reins, appellant has not set forth any evidence to establish that any of the appellees had superior knowledge or control of the tack in question. The uncontroverted evidence established that neither appellee used or maintained the tack in question. In fact, the only "fact" to the contrary set out by appellant is the claim that because it was in the barn, there was an implication that appellee Square owned the tack and/or had a duty to make sure it was safe because she knew it was being used. Such a conclusion is pure speculation. As set out in Scheibel, there is no implied warranty of safety to a social guest. Further, there is no duty because there was no evidence to show appellees knew or should have known of the danger. Beyond the location of the tack in the barn, appellant presented no evidence of any act of appellees which would have reasonably led her to expect that she was being provided with safe tack. Thus, she assumed the ordinary and primary risks of using such a tack as a matter of law. Appellant's first, second and third assignments of error are without merit.
In the fourth and final assignment of error, appellant argues that the trial court erred by failing to consider the opinion of an expert hired by appellant on the issue of what standard of care appellees owed to an inexperienced rider. In her report, the expert opined that appellant's injuries were a direct result of appellees' collective failure to monitor and control the use of Foxy by an inexperienced rider. The trial court did not consider the report because the expert did not personally examine Foxy or the reins.
We agree with the conclusion if not the logic of the trial court that the testimony of the expert was not properly qualified as to relevancy. Specifically, the expert's report was premised on the duty and liability of a commercial horse riding stable, not a private horse owner.
Nevertheless, even if it had been admitted, nothing in the expert's report alters our determination that it was appellant with her personal knowledge who assumed the primary risk of riding Foxy with the subject tack. As previously discussed, appellant admitted she knew Foxy was behaving in an erratic and dangerous manner, even if she did not know the reason for it. Further, she apparently was the last one to perform any acts of maintenance or inspection on the tack. Appellant's fourth assignment of error is without merit.
In light of the foregoing analysis, appellant's four assignments of error are without merit. The judgment of the trial court is affirmed.
 __________________________________________ JUDGE JUDITH A. CHRISTLEY
FORD, P.J., O'NEILL, J., (JOSEPH) Ret., Seventh Appellate District, sitting by assignment, concur.
[1] There was no conclusive evidence as to whether the barn was part of appellee Square's life estate.
[2] Appellant conceded that she did not care for the horses in exchange for the privilege of riding them. Appellant was not told by appellee Nicholson that she could only ride the horses if she helped care for them. Rather, she testified that she helped out with the horses because she believed that the horses needed better care.
[3] This fact was disputed below because appellee Square testified in her deposition that she informed appellant that Foxy and Lucky must not become separated.
[4] Appellee Square, who saw appellant riding Foxy but was actually in the barn at the time of the accident, denied that Lucky was trapped in the barn.
[5] Appellant maintained below that this complaint sounded in negligence only, and did not encompass allegations of reckless or intentional conduct. A review of appellant's appellate brief reveals the same on appeal.
[6] Both appellees clarified their pleadings and alleged the existence of a primary assumption of risk on appellant's part in their motions for summary judgment.
[7] An invitee is a person who "rightfully come[s] upon the premises of another by invitation, express or implied, for some purpose which is beneficial to the owner." Gladon v. GreaterCleveland Regional Transit Auth. (1996), 75 Ohio St.3d 312,315. A licensee, however, is "a person [who] goes upon the land of another by permission and acquiescence for his own pleasure or convenience, and not by invitation, * * *" Fuehrer v. Westerville CitySchool Dist. Bd. of Edn. (1991), 61 Ohio St.3d 201, 204.
[8] This standard of care is virtually identical to that set forth in Trooper A. Riding Academy v. Miller(1934), 127 Ohio St. 545, as the duty owed to an invitee. Here we note that the duty owed to social guests can approach the duty owed to invitees, depending on on the circumstances.
[9] In Lamendola, the parents of an injured child brought suit against a co-participant for injuries that occurred during a a backyard game of horseshoe. In Marchetti, a co-participant in a backyard game of kick-the-can brought suit against another co-participant for injuries. In Thompson, a fellow golfer struck another golfer with an errant ball and the injured golfer brought suit against her co-participant.