[Cite as *Huston v. Brookpark Skateland Social Club, Inc.*, 2020-Ohio-1493.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

MARGARET A. HUSTON,  :

    Plaintiff-Appellant,  :

                      No. 108222

    v.  :

BROOKPARK SKATELAND SOCIAL
CLUB, INC.,  :

    Defendant-Appellee.  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:**  April 16, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-892426

---

## *Appearances:*

McCarthy, Lebit, Crystal and Liffman Co., L.P.A.,
Christian R. Patno, and Colin R. Ray, *for appellant.*

Gallagher Sharp, L.L.P., and Clark D. Rice, *for appellee.*

ON RECONSIDERATION[1]

LARRY A. JONES, SR., J.:

**{¶ 1}** Pursuant to plaintiff-appellant's, Margaret Huston ("Huston"), App.R. 26 application for reconsideration, the opinion as announced on February 13, 2020, *Huston v. Brookpark Skateland Social Club, Inc.*, 8th Dist. Cuyahoga No. 108222, 2020-Ohio-488, is hereby vacated and substituted with this opinion.

**{¶ 2}** Huston appeals from the trial court's February 8, 2019 decision granting summary judgment in favor of defendant-appellee Brookpark Skateland Social Club, Inc. ("Skateland"). For the reasons that follow, we reverse and remand.

**Procedural History**

**{¶ 3}** In April 2017, Huston was injured while she was roller skating at Skateland. In February 2018, she filed a complaint against Skateland, alleging that it was careless, negligent, willful, and wanton and breached its duties under Ohio common law and R.C. 4171.06 and 4171.07, et seq. Specifically, it was Huston's contention that Skateland encouraged and failed to stop skaters who were skating at dangerous speeds, posing risk to the other skaters. Skateland filed an answer generally denying Huston's allegations and asserting affirmative defenses, including assumption of the risk.

---

[1]The original decision in this appeal, *Huston v. Brookpark Skateland Social Club, Inc.*, 8th Dist. Cuyahoga No. 108222, 2020-Ohio-488, released February 13, 2020, is hereby vacated. This opinion, issued after reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 701.

{¶ 4} After discovery was completed, Skateland filed a motion for summary judgment, which Huston opposed. In a February 8, 2019 decision, the trial court granted Skateland's motion. Huston now appeals, contending in her sole assignment of error that the trial court erred by granting Skateland's summary judgment motion. The facts will be discussed in more detail below.

**Law and Analysis**

**Depositions and Affidavits**

{¶ 5} Several people were deposed, or averred in affidavits, about facts relevant to this case. The following is a summation of their testimony or averments.

{¶ 6} At the time of the incident, Huston was in her early to mid-50s. She grew up roller skating recreationally, and in her mid-20s she worked at Skateland in the coatroom and snack bar.

{¶ 7} Huston had not been skating for an approximate ten-year period prior to the incident. She testified that she had stopped skating because of injuries she had sustained when she fell at a private skating party at Skateland. The circumstance surrounding that injury involved Huston holding the hand of a young child she was skating with and attempting to prevent the child from falling, which caused Huston to fall. Huston did not file any claim or complaint against Skateland regarding that incident.

{¶ 8} The incident relative to this case occurred on a Thursday evening, which was generally a night for social recreational skaters at Skateland. On that

night, Huston saw one skate guard on duty, skating around. She was skating with an old acquaintance, Patrick Perotti ("Perotti"), when she got "knocked, slammed into" from behind, and "went up in the air before coming down." According to Huston, she did not see any skaters skating in violation of the rules prior to being hit. She testified that she was skating carefully, especially because she had not been skating for a ten-year period prior to the incident.

{¶ 9} Huston was removed from the skating rink floor by emergency medical personnel and transported to the hospital. As a result of the fall, Huston sustained a broken shoulder, broken hip, had two surgeries and anticipated a third one, was wheelchair and nursing home bound for a period, and required extensive physical therapy.

{¶ 10} Huston's old acquaintance, Perotti, had been a regular skater at Skateland since the late 1960s. He and Huston were not close; rather, they just generally knew each other from skating at Skateland. Perotti testified that in the few years leading up to the incident, he observed "in-line speedskaters" skating at the Thursday evening sessions. According to Perotti, the in-line skates are designed to make the skater skate faster than the "normal quad" skates that he, Huston, and most of the other skaters wore.

{¶ 11} Perotti testified that the in-line skaters at Skateland skated at excessive and dangerous rates of speed, and dangerously weaved in and out of other skaters. According to Perotti, there were in-line skaters who were skating in

such a manner at the time Huston was hit.  Perotti saw three in-line skaters skating dangerously fast that evening, including the in-line skater who hit Huston.

{¶ 12}  According to Perotti, the unsafe skaters would violate the rules "in front of the floor supervisors."  Perotti testified that, on the night of the incident, the behavior of the skater who hit Huston was "observable by the floor supervisor as [the skater] passed him multiple times * * *."  Thus, it was Perotti's opinion that the supervisor had "ample opportunity to stop and correct this behavior * * * prior to [Huston] being struck by this reckless individual."

{¶ 13}  Perotti described the incident with the skater and Huston as follows: he saw Huston "suddenly go up in the air" after the in-line skater "plowed into her and mowed her down from behind."  Perotti described the in-line skater as skating a lot faster than the "regular" skaters — as he described, skating like an adult hockey player.

{¶ 14}  The floor rink guard on duty the evening of the incident was Dennis Schreiber ("Schreiber").  He testified that it was his responsibility to make sure the skaters were not skating recklessly.  Thus, he would constantly scan the rink to make sure the patrons were skating in accordance with Skateland's rules and regulations.

{¶ 15}  Schreiber testified that in-line skaters generally skated at Skateland, particularly on Thursdays, and that some were there on the evening Huston was injured.  Schreiber described that the in-line skaters often would get together in a line one behind the other and skate around the rink like one would see speed

skaters skate in the Olympics. He admitted that the in-line skaters skated faster than the "regular" skaters, and that he has previously had to blow his whistle, and tell them to slow down and separate because they were skating too fast. Schreiber testified that he was familiar with the in-line skater who hit Huston, but maintained that he had never had a problem with that skater in the past. On the evening of the incident, Schreiber did not observe the in-line skater skating at an excessive speed.

{¶ 16} The owner of Skateland, Trent Bradman ("Bradman"), was also deposed. Bradman testified that it was the skate guards' duty to monitor the speed of the skaters, to make sure that they were skating at a safe speed so that the rink is safe for all skaters, which includes child skaters, elderly skaters, and skaters of varying skill abilities. Racing on the rink is a rule violation, and the skate guards are supposed to stop it if they observe it.

{¶ 17} Bradman testified that in-line skaters are permitted at Skateland. He gives the guards at Skateland the rules of the Roller Skating Association of America ("RSA") and expects them to follow them. Bradman testified that according to the RSA rules, when a skater is consistently passing a majority of the other skaters, he or she is skating too fast, and the guard should blow his or her whistle, approach the skater, and tell him or her to stop skating in such a manner. Bradman admitted that if Huston was struck by a skater who was consistently passing the majority of the skaters on the floor, and the skate guard on duty had the opportunity to see this, but did not interject, the skate guard would have

breached his or her duties.  Bradman also admitted that Huston herself did not do anything to cause her injury on the date of the incident.

{¶ 18} The other witnesses who were working at the time of the incident — the disc jockey, rink manager, and snack bar attendant — did not see Huston get struck or the alleged speeding in-line skater who struck Huston.  But the rink manager corroborated that in-line skaters frequent Skateland and skate around the rink in close proximity to each other like ice speedskaters.  She testified that the skate guards are supposed to constantly scan the rink and position themselves on the floor so that they can see the entire floor.  According to the manager, the snack bar attendant and the disc jockey are supposed to be looking as well and call dangerous skaters to the attention of the skate guard.

**Summary Judgment Standard**

{¶ 19} Summary judgment shall not be rendered unless the moving party demonstrates that (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, with the nonmoving party being entitled to have the evidence construed most strongly in its favor.  Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183, 677 N.E.2d 343 (1997).  Appellate review of summary judgment motions is de novo.  *Motorists Mut. Ins. Co. v. Natl. Dairy Herd Improvement Assn., Inc.*, 141 Ohio App.3d 269,

275, 750 N.E.2d 1169 (10th Dist.2001). Accordingly, we stand in the shoes of the trial court and conduct an independent review of the record.

{¶ 20} Huston raises two issues in this appeal: (1) whether the roller rink is liable for failing to comply with its statutory duties for rink operators and floor supervisors, and/or (2) whether the roller rink can be found liable pursuant to common law for willful, wanton, or reckless conduct. Our original opinion resolved only the second issue. We consider the first issue in this reconsidered opinion.

**R.C. Chapter 4171**

{¶ 21} R.C. Chapter 4171 contains a comprehensive set of rules governing the operation of roller skating facilities in Ohio. R.C. 4171.05, entitled "Encouragement of roller skating; need for minimum safety standards," provides as follows:

> The general assembly acknowledges that the recreational sport of roller skating is practiced by a large number of citizens of Ohio, provides a wholesome and healthy family activity which should be encouraged, and significantly contributes to the economy of this state. The general assembly further acknowledges that roller skating as a recreational sport can be hazardous to roller skaters and that minimal safety standards for, and duties and responsibilities of, operators and roller skaters are in the public interest.

{¶ 22} R.C. 4171.07[2] governs floor supervisors, and reads in relevant part as follows:

> Each operator shall maintain at least one floor supervisor on duty for every one hundred seventy-five roller skaters when the roller skating

---

[2]R.C. 4171.06 delineates rink operator's duties. Huston does not allege Skateland violated any specific rink operator's duties set forth in R.C. 4171.06.

rink is open for sessions. The floor supervisor shall be in a position to observe the skate floor and shall monitor activity on the skate floor and be available to assist skaters in understanding and adhering to the responsibilities of roller skaters set forth in section 4171.08 of the Revised Code. The floor supervisor shall comply with the duties of a floor supervisor as defined by the roller skating rink operators of America or its successor organization, including directing traffic and assisting roller skaters who may fall or sustain injuries. The floor supervisor also shall issue warnings, reprimands, or penalties to roller skaters upon their violation of the responsibilities set forth in section 4171.08 of the Revised Code.

{¶ 23} R.C. 4171.08 governs the duties of the roller skaters, and provides:

Each roller skater shall:

(A) Maintain reasonable control of his [or her] speed and course at all times;

(B) Heed all posted signs and warnings;

(C) Maintain a proper outlook to avoid other roller skaters and objects;

(D) Accept the responsibility for knowing the range of his [or her] own ability to negotiate the intended direction of travel while on roller skates and to skate within the limits of that ability;

(E) Refrain from acting in a manner that may cause or contribute to the injury of himself [or herself] or any other person.

{¶ 24} Recognizing that roller skating can be an inherently dangerous activity, R.C. 4171.09 sets forth the risk that a skater is assumed to have taken as follows:

The general assembly recognizes that roller skating as a recreational sport can be hazardous to roller skaters regardless of all feasible safety measures that can be taken. Therefore, roller skaters are deemed to have knowledge of and to expressly assume the risks of and legal responsibility for any losses, damages, or injuries that result from contact with other roller skaters or spectators, injuries that result from falls caused by loss of balance, and injuries that

involve objects or artificial structures properly within the intended path of travel of the roller skater, which are not otherwise attributable to an operator's breach of his [or her] duties pursuant to sections 4171.06 and 4171.07 of the Revised Code.

{¶ 25} Thus, assumption of the risk is a "complete defense in a tort or other civil action against an operator by a roller skater for injuries resulting from the assumed risks of roller skating * * * unless the operator has breached the operator's duties pursuant to sections 4171.06 and 4171.07 of the Revised Code." R.C. 4171.10.

{¶ 26} When applying any statute, the primary goal is to correctly ascertain and effectuate the legislature's intent in enacting the statute. *Brooks v. Ohio State Univ.*, 111 Ohio App.3d 342, 349, 676 N.E.2d 162 (10th Dist.1996). As such, it is well established that a court must first examine the plain language of the statute to determine the legislative intent. *State ex rel. Burrows v. Indus. Comm.*, 78 Ohio St.3d 78, 81, 676 N.E.2d 519 (1997). If the language used in a statute has a clear and unambiguous meaning, the statute must be applied as written, and no further interpretation is necessary. *Id.* Conversely, only when the language is reasonably susceptible to more than interpretation, does a court have the authority to engage in further interpretation of the statute. *Id.* In other words, we do not have the authority to ignore the plain meaning of a statute under the guise of statutory interpretation, but must give effect to the words used.

{¶ 27} Here, the legislature has clearly and unambiguously made known its intent that roller rink operators, through their floor supervisors, are to "be

available to assist skaters in understanding and adhering" to their responsibilities as skaters, and to direct traffic and assist hurt skaters. R.C. 4171.07. R.C. 4171.07 also requires floor supervisors to observe the skate floor and "issue warnings, reprimands, or penalties to roller skaters upon their violation of the responsibilities set forth in section 4171.08."

{¶ 28} R.C. 4171.08 delineates the duties of roller skaters such as maintaining a proper lookout and reasonable control, avoiding other roller skaters, and not acting in a manner that may cause injury to others. The plain language of the statute requires floor supervisors to issue warnings and reprimands upon a roller skater violating his or her duty to other skaters. The statute does not provide that roller rink operators owe a duty to protect roller skaters from the inherent risks of roller skating such as coming in contact with other roller skaters.

{¶ 29} Rather, R.C. 4171.09 specifically recognizes that roller skating is a recreational sport that "can be hazardous to roller skaters regardless of all feasible safety measures that can be taken." Therefore, under R.C. 4171.09, the legislature specifically provided that roller skaters assume "the risk of and legal responsibility for any losses, damages, or injuries that result from contact with other roller skaters" and assumption of the risk "shall serve as a complete defense in a tort action or other civil action against an operator by a roller skater for injuries resulting from the assumed risks of roller skating." Thus, the Revised Code does not provide that the roller rink owes a duty to protect skaters from the risks inherent to roller skating such as coming in contact with other skaters; rather, its

duty is just to issue warnings, reprimands, or penalties when a roller skater violates a duty owed by a roller skater to other skaters. Huston has not provided this court with any case law stating otherwise.

{¶ 30} Based on the undisputed facts in this case, we find that R.C. 4171.07 does not impose a statutory duty on Skateland to prevent other roller skaters from coming in contact with Huston. However, a roller rink may be liable per common law for willful, wanton, or reckless conduct as discussed below.

**Willful, Wanton, Reckless Standard**

{¶ 31} The Ohio Supreme Court has held that when "individuals engage in recreational or sport activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either 'reckless' or 'intentional' as defined in Sections 550 and 8A of the Restatement of Torts 2d." *Marchetti v. Kalish*, 53 Ohio St.3d 95, 559 N.E.2d 699 (1990), paragraph one of the syllabus. "In other words, between participants in a sporting activity, there is no liability for injuries caused by negligent conduct." *Deger v. Super Skate*, 2d Dist. Greene No. 92-CA-70, 1994 Ohio App. LEXIS 2248, 3 (May 27, 1994), citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 559 N.E.2d 705 (1990). However, willful or wanton conduct in reckless disregard of a plaintiff's safety is not protected by the primary assumption of risk rule. *See Thompson* at 104 ("While we believe there can be no actionable negligence between participants in a sport, we do not embrace the notion that a playing field is a freefire zone.").

The Second Appellate District delineated the difference between negligence and recklessness as follows:

> Negligence consists of "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency." *Marchetti*, supra, at 100 n.3, citing Restatement of the Law 2d, Torts (1965), at 590, Section 500 comment g. On the other hand, conduct is in reckless disregard of the safety of another if the actor "does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Id.* citing Restatement of the Law 2d, Torts, supra, at 588, Section 500. The risk of harm the actor creates "must itself be an unreasonable one under the circumstances." Restatement of the Law 2d, Torts, supra, at 588, Section 500 comment a.

*Deger* at 3-4.

{¶ 32} Skateland contended in its motion for summary judgment that Huston assumed the risk of roller skating and it was, therefore, not liable for her injuries; the trial court agreed.

{¶ 33} Although contact with other skaters is an inherent risk of roller skating as set forth under R.C. 4171.09, and skaters assume the risk of contact, as mentioned, willful, or wanton conduct in reckless disregard of a skater's safety is not protected by assumption of the risk.

{¶ 34} After review of this record, we find that a genuine issue of fact exists regarding whether Skateland's conduct was willful or wanton in reckless disregard of Huston's safety. Specifically, Perotti, a witness to the incident, testified that he saw the in-line skater who hit Huston skating at a dangerous and excessive speed

prior to hitting her. Perotti further testified that the in-line skater's behavior was observable multiple times by the floor supervisor, and that the floor supervisor had the opportunity to stop and correct the in-line skater. We therefore find that a genuine issue of material fact exits regarding whether Skateland's conduct was willful or wanton in reckless disregard for Huston's safety, and the trial court erred in granting summary judgment in Skateland's favor.

{¶ 35} Reversed and remanded.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

LARRY A. JONES, SR., JUDGE

ANITA LASTER MAYS, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR