[Cite as *Valero v. Futrell*, 2025-Ohio-2843.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Manuel Valero

    Appellant

v.

Michael Futrell, et al.

    Appellees

Court of Appeals No.  L-24-1295

Trial Court No.  CI-2023-1674

**<u>DECISION AND JUDGMENT</u>**

Decided: August 12, 2025

* * * * *

Elizabeth Bonham, Sarah Gelsomino, and Marcus Sidoti, for appellant.

Dale R. Emch, Jeffrey B. Charles, Edward T. Mohler, and Michael E. Walton, for appellant.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} This matter is before the court upon appeal of the judgment of the Lucas County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Michael Futrell and Ian Hodge and finding the defendants-appellees were entitled to statutory immunity as to the complaint of plaintiff-appellant, Manuel Valero. For the reasons that follow, we affirm the judgment.

## II. Procedural History

{¶ 2} On February 28, 2022, between 1:00 and 2:00 a.m., Toledo Police Officer Michael Futrell responded to reports of gunshots at Valero's apartment complex. Futrell arrived and observed Valero sitting on the tailgate of a pickup, lighting fireworks from his hand. Futrell parked next to the pickup, turned on his body camera, and approached Valero after radioing for backup.

{¶ 3} Futrell shone a flashlight in Valero's direction and asked him to stop lighting fireworks. Valero put the fireworks down, picked up a knife, and rose from the tailgate and approached Futrell. In response, Futrell drew his weapon and pointed it at Valero while backing away. Valero asked Futrell to shoot him and pointed to his head and chest while moving toward Futrell. Valero then turned the knife on himself and appeared to press the knife into his chest. Futrell repeatedly ordered Valero to put the knife down and Valero did not comply. Futrell called for additional backup, reporting Valero was armed with a knife.

{¶ 4} Moments into the encounter, Officer Ian Hodge arrived on scene. Hodge turned on his body camera and approached, and he observed Valero, knife in hand, walking toward Futrell as Futrell backed away. Valero then turned to Hodge and shouted, "Shoot me!" Hodge ordered Valero to drop the knife multiple times, and when Valero refused, Hodge fired a warning arc from his taser. Valero backed up and held the knife to his own chest, and Hodge fired the taser at Valero, connecting to Valero's back and side with no effect. Valero pulled at the taser barbs and stepped toward Hodge, holding the knife at his side. Valero continued to ignore orders to drop the knife. As Hodge drew his

2.

weapon, Futrell shot Valero twice, wounding Valero in the upper arm and the torso. The officers called for an ambulance and rendered aid until rescue arrived. Valero survived his wounds.

{¶ 5} On February 27, 2023, Valero filed a civil suit against Futrell and Hodge, alleging the shooting was an unjustified use of lethal force against a person with a well-documented history of suicide attempts, and the shooting caused permanent and ongoing injuries. In the first count of the complaint, Valero alleged Futrell and Hodge breached their duty to exercise due care and act in a lawful and reasonable manner by negligently and recklessly causing serious physical injury to Valero. In the second count, Valero alleged Futrell and Hodge committed assault and battery. In the third count, Valero alleged Futrell and Hodge committed intentional infliction of emotional distress as a result of their outrageous conduct. Valero's complaint, therefore, alleged tort claims.

{¶ 6} Futrell and Hodges filed an answer and raised affirmative defenses including immunity for tort claims pursuant to R.C. Chapter 2744.

{¶ 7} As part of discovery, Valero, Futrell, and Hodge were each deposed.

{¶ 8} Futrell testified regarding policy and training concerning people suffering from a mental health crisis as well as policy and training concerning the use of force. Futrell indicated the weapon was the primary concern and he addressed Valero's refusal to put his knife down. Futrell testified that he is trained to consider any knife as a deadly weapon for purpose of the "use of force" policy, without regard to the size of the knife. He acknowledged that mere possession of a knife does not justify deadly force, but in

3.

considering whether the knife poses a threat of deadly force, he testified as to his training on the use of force as follows:

> It's the intent to use the knife, what they're doing with it, are they saying anything. So somebody merely just standing there holding one, especially if we don't know why they're holding it, that doesn't constitute it just in itself, but it depends on what they're doing.
>
> …
>
> Verbal, verbalizing that they're going to stab somebody, walking towards somebody else with it clenched in their hand, maybe how they're holding it, maybe gripping it kind of tight, which would be better if they were to actually use it, that shows intent, or picking it up when they didn't already have it in their hand.

Futrell also testified that he considered other factors, such as whether they were "stabbing other things, maybe they're preparing to use it by stabbing other items first…"

{¶ 9} Futrell testified that he unholstered his weapon after Valero picked up a knife and stepped toward Futrell. As Valero came within three or four feet, Futrell raised his weapon and pointed it in Valero's direction. Futrell described the entire encounter as follows:

> Okay. So unholstered my weapon, put it on him, he started walking towards me and he goes, what are you going to do, shoot me, and I said, if you come at me with that knife, yes, and he points here and right here, and I'm just like, man, drop the knife, giving him orders to put the knife down. And then he takes the knife, I believe this is when I reholstered, he kind of did a poor attempt at like trying to stab himself with it and then he puts it back down at his side and then is walking towards me. I did notice his grasp on the knife, he had his hand on it, his thumb on the blade, which will give you a little more leverage on the knife if you were to stab something, he was walking towards me, I just continue to give commands, I had my responding crews make a code three response due to him having a knife. So still giving verbal commands, he's walking towards me, then he would back up a little bit, then he would walk towards me again trying to get me to shoot him. So I just kept my weapon on him and just kept trying to keep a gap between him and I. And then I see my backup pull in so I signal with my flashlight where I was at and then that's when Officer Hodge pulls up.

He gets out of the car, comes up, he sees what's going on, sees that, you know, Mr. Valero had the knife and I had my gun out, so he decides to pull out his taser and then, you know, give him warnings with the taser, hey, drop the knife, that way we got one officer with a less lethal, one officer with a lethal, which is ideal. Then he gives a warning arc and then actually like hits the arc button to give him a warning, we're still pleading with him, hey, drop the knife, you don't want to do this, you know, all that stuff. And then – then he takes off his sweatshirt, he had on a black sweatshirt with a white t-shirt under it, took off that and then kind of does this and like cracks his neck and loosens up a little bit, still with a knife in his hand, which to us is a sign of aggression, then he takes the knife and then stabs himself again and does it to the point where I can see blood starting to get soaked up in his white t-shirt, spot probably like that (indicating) in the center of him. And then at that point, after he did that he's kind of cringed a little bit like that, and then he turns around, his back is to Hodge, he's kind of at an angle to me, and then that's when Hodge fired and shot his taser to try to hit him in the back, which is a preferred area to hit somebody with with [sic.] a taser just because of the wide area, nothing vital back there. After he hits him with that he turns around and then he fires that, when he realizes his first cartridge wasn't effective, he fires another cartridge like right after. And then Mr. Valero goes, what the fuck, and then I think calls him a bitch and then says, what the fuck do you think that's going to do, and rips the probes out of his chest. And then at that point he took two quick steps towards Officer Hodge with that knife still in his hand and that's when I shot him twice.

{¶ 10} Futrell further testified that, at the time he shot Valero, he believed "he posed a serious threat to Officer Hodge as well as myself, and we already tried the less lethal twice, which was not effective[.]" Futrell noted that Valero had already "charged at both of us with [the knife] trying to get us to shoot him." Futrell also perceived Valero's steps toward Hodge "were much quicker than they were in the beginning" and Valero had become "more aggressive, more amped up after he was tased[.]"

{¶ 11} Officer Ian Hodge was deposed, and described similar training and understanding of policy, including policy that classes a knife of any size as a deadly

weapon when that knife is wielded like a weapon.[1] Hodge also testified regarding his certifications for using a taser. Hodge's recollection of policy, however, was not recent, as Hodge is now employed with the Metroparks system as a police officer. Hodge left the Toledo Police about a year after the shooting, for personal reasons unrelated to the shooting.

{¶ 12} As to de-escalation training, Hodge testified that the goal is to defuse the situation and disarm the person, but if the person is threatening themselves or others with the weapon, "if the situation were to change to where the threat is increased, we have to take action…to stop the threat." He further testified that if the "focus of self-harm turns into harming someone else, then our behavior in how we handle the situation changes."

{¶ 13} Immediately before the shooting, Hodge deployed his taser. He testified that it was the first and only time he used his taser during his career. Hodge testified that if a taser had no effect, the firearm is an appropriate next measure in certain circumstances. He stated, "If the taser was completely ineffective then we would have to move to another form of force, and, again, that would determine – be determined based on the situation." Hodge testified that he arrived on scene and observed Valero armed with a knife and Futrell training his gun on Valero, trying to get Valero to drop his knife while Valero was asking Futrell to shoot him. Hodge drew his taser and gave a verbal command to Valero to drop his knife. Hodge testified that Valero used the knife on

---

[1] The knife is not clearly visible in the video recordings. A photograph of the knife was included in the record as a deposition exhibit and Futrell described it as a black, folding pocketknife with a 3-inch blade.

6.

himself but also pointed it at Futrell and Hodge, "showing intent to the use the knife." Hodge testified that, throughout the encounter with Valero, Valero would close the distance with Futrell or with Hodge, and both officers attempted to keep a safe distance from Valero.

{¶ 14} Hodge testified he made the decision to use the taser because of the imminent threat of harm, based primarily on Valero's use of the knife on himself as well as his threatened use against the officers. Hodge indicated that, at the time he attempted to incapacitate Valero with the taser, he viewed Valero as a threat to the officers "because several times during the encounter he would wave the knife around and approach us with the knife." After the taser failed, he noted Valero "grew more aggressive, more agitated." Hodge indicated that Valero tried to remove the barbs from the taser while taking steps toward Hodge with the knife. Valero's body language communicated an intent to use the knife on Hodge, with Hodge noting,

> "…he was rolling his shoulders, kind of getting into what we call a fighting stance or getting ready to fight and he, again, he stated something along the lines of, what do you think that's going to do, like implying that he's willing to take the knife and turn it on himself also point it at us and walk towards us means he's willing to put the knife on us, so he's still a threat and with him beginning to walk towards me with the knife and say what he did and show physical responses like he did, he is still a threat and he's focused now on me because I shot the taser."

{¶ 15} Hodge added that as Valero approached him, "his behavior and him beginning to approach me with the knife," caused Hodge to draw his own weapon to defend himself. Hodge testified that his weapon was pointed at Valero when Futrell shot Valero. Hodge approached Valero on the ground and kicked the knife away, and

7.

immediately reported shots fired and called for a medical response. Hodge then retrieved a first aid kit and he and Futrell provided aid until an ambulance arrived.

{¶ 16} Valero also gave testimony at a deposition. On the night of the shooting, he was experiencing a mental health crisis and admitted to drinking before attempting suicide by cop, which he indicated was not a premeditated plan but something he opted for once Futrell arrived on scene. He normally takes medication, but before the shooting, he had been without medications because he ran out about 30 or 60 days before. Subsequently, Valero admittedly made another attempt to commit suicide by cop, in Perrysburg, Ohio. Valero's suicide attempts also included cutting his wrist, attempted hanging, and overdose.

{¶ 17} As to the shooting, Valero testified that he heard the commands to drop the knife but refused to drop the knife because "I had reached a point where I didn't want to live anymore." Valero testified that he tried stabbing himself, but he could not get the knife to puncture his skin. At the same time, Valero testified that he was afraid of getting hurt and suffered emotional distress because the officers pointed guns at him and used a taser. When asked if he could avoid being shot or distressed by complying with commands to drop the knife, Valero responded, "I don't know."

{¶ 18} The officers moved for summary judgment based on immunity. They did not dispute Valero's mental health issues, but argued they appropriately responded to Valero's "unpredictable and violent" actions at the time of the shooting, following their training for confronting an armed individual. In support, the officers relied on the body camera recordings and deposition testimony of the officers and Valero. The officers

8.

sought "an order dismissing all of [Valero's] claims against the named Officers with prejudice."

{¶ 19} In response, Valero agreed that immunity could only apply if Futrell and Hodge did not act recklessly in performing their duties, noting the issue of recklessness is a fact-specific determination. Valero opposed summary judgment, arguing Futrell and Hodge demonstrated reckless behavior in escalating the situation and aggravating Valero, leading to shooting Valero without necessity. Valero cited the body camera recordings in support of his argument that Futrell and Hodge failed to follow procedure for dealing with a person experiencing a mental health crisis.

{¶ 20} Valero also submitted an expert opinion, finding the officers failed to follow training in dealing with a person in crisis and that lethal force was not reasonably necessary because Futrell and Hodge should have notified their supervisor and requested additional officers, while also attempting to defuse the situation by attempting "to disrupt [Valero's] negative thought patterns by making small requests" and using other de-escalation techniques. Additionally, the expert was critical that Futrell and Hodge "remained in close proximity and repeatedly told [Valero] to drop the knife and pointed weapons at him which is contrary to the training they received[.]" Finally, the expert believed the officers should have used cover and distance to ensure their safety in the event Valero attempted to assault them, with lethal force not justified.

{¶ 21} In ruling on summary judgment, the trial court considered the camera footage, the depositions, the relevant police policies, and the expert reports. The trial court noted that recklessness is generally a jury question, but under R.C.

9.

2744.03(A)(6)(b), the standard for recklessness is a "rigorous standard" when applied to police performing official duties, including arresting and detaining a person who violates the law. The trial court determined Futrell and Hodge were immune from suit and granted summary judgment for the officers.

{¶ 22} Valero appealed this decision, arguing the jury should decide whether Futrell and Hodge acted recklessly, for purposes of applying R.C. 2744.03.

### III. Assignment of Error

{¶ 23} On appeal, Valero argues a single assignment of error, as follows:

1. The trial court erred in granting Defendants' Motion for Summary Judgment.

   a. The court below failed to adhere to the Rule 56 standard when it concluded there is no triable fact issue here.

   b. Mr. Valero presented evidence from which a reasonable jury could conclude that Defendants recklessly breached their duty of care to Mr. Valero.

   c. The Court should have concluded that Defendants waived, or insufficiently supported, their Motion as to claims for assault and battery and IIED.

### IV. Analysis

{¶ 24} Valero argues summary judgment was not proper because issues of fact remained for trial regarding recklessness, considering the evidence of the officers' conduct in shooting him. Valero further argues that the trial court improperly determined immunity applied to his claims for assault and battery and intentional infliction of emotional distress.

10.

**{¶ 25}** We apply de novo review to the trial court's grant of summary judgment under Civ.R. 56(C). *Price v. Telb,* 2009-Ohio-3496, ¶ 7 (6th Dist.), citing *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996). As such, our review is independent, and without deference to the trial court's findings regarding the evidence. *Smathers v. Glass,* 2022-Ohio-4595, ¶ 30, citing *Wilmington Savs. Fund Soc., FSB v. Salahuddin,* 2020-Ohio-6934, ¶ 20 (10th Dist.).

**{¶ 26}** We must construe the evidence most favorably for Valero as the non-moving party and determine whether genuine issues of fact exist and whether reasonable minds could differ as to these issues, preventing an entry of summary judgment. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 66 (1978). "A 'material fact' is one which would affect the outcome of the proceedings under the applicable substantive law." (Citations omitted) *Murtha v. Rossford Exempted Village Schools,* 2024-Ohio-1798, ¶ 36 (6th Dist.).

**{¶ 27}** Futrell and Hodge claimed governmental immunity under R.C. Chapter 2744. The immunity statutes provide broad immunity to political subdivisions and their employees, subject to enumerated exceptions, with immunity extending to intentional tort claims. *Wilson v. Stark Cty. Dept. of Human Serv.,* 70 Ohio St.3d 450, 452 (1994). Therefore, a finding of immunity bars all of Valero's claims.

**{¶ 28}** For an individual employee of a political subdivision, R.C. 2744.03(A)(6) applies, providing defenses and immunities to establish nonliability in a civil action for damages arising from an act or omission connected to a governmental function. *See Lambert v. Clancy,* 2010-Ohio-1483, ¶ 10, citing *Cramer v. Auglaize Acres,* 2007-Ohio-11.

1946, ¶ 17 ("For claims against individual employees, the three-tiered analysis used to determine whether a political subdivision is immune is not used."). Therefore, "R.C. 2744.03(A)(6) provides that an employee is personally immune from liability unless '(a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code.'" *Lambert* at ¶ 10, quoting R.C. 2744.03(A)(6).

{¶ 29} Pertinent to this case, the parties dispute whether Futrell and Hodge are immune based on R.C. 2744.03(A)(6)(b), which provides an employee immunity unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Valero argues Futrell and Hodge acted recklessly, and the evidence presented established a genuine issue regarding recklessness that must be determined at trial. In response, Futrell and Hodge argue summary judgment is appropriate on this issue, as there is no evidence to demonstrate recklessness, or wanton conduct, necessary to demonstrate a genuine issue of material fact.

{¶ 30} Each party frames the material issue differently. Valero frames the issue as concerning the officers' response to a mental health crisis, arguing the officers failed to follow policy, training, and standards in dealing with a person in crisis. Futrell and Hodge frame the issue relative to the officers' response to an armed individual who posed a threat of physical harm. The trial court applied R.C. 2744.03(A)(6)(b) and addressed the conduct of Futrell and Hodge based on the use of force, considering both the mental

12.

health crisis and the danger of physical harm, and granted judgment to the officers as to all claims, finding no genuine issue regarding wanton or reckless conduct. We agree.

{¶ 31} Wanton or reckless conduct requires more than mere negligence, and while the issue is generally a factual matter for a jury, the "standard for showing wanton misconduct is…high." *Fabrey v. McDonald Village Police Dept.,* 70 Ohio St.3d 351, 356 (1994). Wanton misconduct requires demonstration of "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon,* 2012-Ohio-5711, ¶ 33, citing *Hawkins v. Ivy,* 50 Ohio St.2d 114, 117-118 (1977). "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." (Citation omitted) *Anderson* at ¶ 34.

{¶ 32} Valero's argument of wanton and reckless conduct rests on his claim that Futrell and Hodge violated their mental health crisis training by escalating the situation and mistreating a suicidal person. As support, Valero cites the body camera video, showing the officers shouting commands at Valero to drop his knife and the use of a taser to stop Valero from cutting himself. Valero argued that the "officers were trained to spend hours helping a suicidal person become safe, and nothing was stopping them from doing so, or calling for help[.]" Valero does not address Futrell's and Hodge's response under their separate training relative to the use of force when confronted with an armed individual, advancing toward officers with a weapon.

13.

{¶ 33} The sequence of events in this case are documented through body camera recordings, and both Futrell and Hodge testified regarding their belief of the imminent threat posed by Valero, with Valero's testimony acknowledging that he was attempting suicide by cop; he heard the commands to drop his knife but chose not to comply because he wanted to end his life. Thus, there is no dispute that Futrell and Hodge encountered a suicidal Valero who refused to drop his knife, and instead, chose to provoke a violent reaction from Futrell and Hodge. These undisputed facts are not negated by Valero's claims that Hodge escalated the situation by using the taser or his argument that Futrell and Hodge failed to follow their procedure for responding to a mental health crisis.

{¶ 34} Valero, furthermore, fails to address Futrell's and Hodge's reliance on their use of force training, arguing instead that he did not attempt to stab the officers or, in his mind, pose a real threat to the officers. In considering the record, we must determine whether reasonable minds could find Futrell and Hodges acted in a reckless or wanton manner in responding with lethal force, viewing the facts in a light most favorable for Valero. *Smathers,* 2022-Ohio-4595, at ¶ 34.

{¶ 35} The facts demonstrate that Valero was armed with a knife, refused to put his knife down, and became increasingly agitated while expressing an intent to commit suicide by cop. Hodge attempted to disarm Valero without success by using a taser, a less than lethal force. Futrell made the decision to shoot Valero only after he observed Valero take two steps in Hodge's direction, still armed with the knife and angry at Hodge over being tased. Courts have addressed similar facts in finding an officer shooting was not wanton or reckless, with immunity applying to state tort claims.

14.

{¶ 36} In *Lytle v. Columbus,* 70 Ohio App.3d 99 (10th Dist.1990), the Tenth District Court of Appeals found no evidence to support recklessness for purposes of R.C. 2744.03(A)(b)(6), where officers shot and killed Lytle in his home after responding to a call reporting Lytle as suicidal. *Id.* at 106. The evidence included expert testimony demonstrating several breaches of police procedure and the record demonstrated officers failed "to obtain pertinent information on arriving at the Lytle home" and responded to Lytle stabbing himself in the chest by spraying mace in his face, escalating matters. After Lytle charged police and was shot the first time causing him to collapse to the floor, the officer failed to secure Lytle's knife, handcuff Lytle, or take Lytle's vital signs, believing Lytle was incapacitated. *Id.* at 102-107. After Lytle rose, surprised the officer, and attempted to seize his partner's shotgun, the officer was not in position to respond with less lethal force without entering the line of fire, and his partner shot Lytle twice more, killing him. *Id.* at 102.

{¶ 37} The Tenth District found a reasonable jury could not find the officer's conduct was reckless, applying the definition of "recklessness adopted by the Ohio Supreme Court in *Marchetti v. Kalish,* 53 Ohio St.3d 95, 96, fn. 2 (1990):

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Id.* at 107 (additional citation omitted.). In finding no issue of fact regarding recklessness, the Tenth District noted that the officer attempted to calm Lytle and first used less than

15.

lethal force to contain him, and even if the facts demonstrated negligence, "given all reasonable inferences in plaintiffs' favor, the evidence [did] not demonstrate the requisite recklessness to sustain a state law claim" against the officer. *Id.* at 107.

{¶ 38} In another case involving a lethal response on a suicide call, the Tenth District again distinguished between negligence and the reckless conduct necessary to impose liability under R.C. 2744.03(A)(6)(b). In *Caudill v. Columbus,* 2017-Ohio-7617 (10th Dist.), the responding officer failed to request a trained negotiator and immediately approached the home of Julie Caudill (the alleged suicidal person), knocked, and demanded Julie open the door. Julie opened the door and pointed her gun at the officer, who responded by shooting and killing Julie. *Id.* at ¶ 8-9. In determining no reasonable jury would find recklessness, the Tenth District noted that, "in determining whether police conduct rises to the level of recklessness, the Supreme Court directs us to consider whether there was a conscious disregard of or indifference to a known risk that was *unreasonable* under the circumstances. (Emphasis sic.) *Id.* at ¶ 29, citing *Anderson,* 2012-Ohio-5711, at ¶ 34. Because the officer reasonably believed he was in imminent danger, his response with lethal force was not unreasonable. *Id.,* citing *Hayes v. Columbus,* 2014-Ohio-2076, ¶ 31 (10th Dist.).

{¶ 39} This case involves a similar threat, occurring after early attempts to diffuse the situation failed and Valero's agitation had increased. While the officers may have unintentionally or even negligently increased Valero's agitated state, with no evidence to suggest an intentional aggravation, the parties otherwise agree that Valero was armed with a knife and refused to drop the knife, with Valero indicating he hoped to end his life,

16.

which would require provoking one or both officers to shoot and kill him. Whether Valero was in crisis and intended to stab either officer, therefore, are not determining factors, as the issue was the threat each officer reasonably perceived because of Valero's conduct.

{¶ 40} The burden of demonstrating recklessness to deny immunity to an officer performing his or her duty "is onerous." *Argabrite v. Neer,* 2016-Ohio-8374, ¶ 31. Additionally, we must view the officers' actions through the "unique lens" which the officer's role in society creates in determining whether those actions were wanton or reckless. *Id.* at ¶ 16. "[N]o other public employee faces the potential danger, violence or unique statutory responsibilities a law-enforcement officer faces." *Id.* at ¶ 15. Consequently, "recklessness" requires more than negligent conduct. *Fabrey,* 70 Ohio St.3d at 356. In this case, Valero demonstrates negligence, at best, and the facts related to the use of force demonstrate Futrell and Hodge were in fear of the imminent threat posed by Valero, armed with a knife and intent on provoking a response from the officers.

{¶ 41} Accordingly, we find Valero's sole assignment of error not well-taken. Based on the record evidence, and construing that evidence most favorably for Valero, we find that summary judgment is appropriate in this case pursuant to R.C. Chapter 2744 as to the claims alleged in Valero's complaint.

17.

## V. Conclusion

**{¶ 42}** Finding substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See also, 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, J.

_____
JUDGE

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.